**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CYRUS R. SANDERS,** | : | |
| **Plaintiff** | : | **CIVIL NO. 1:10-CV-01241** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **EMANUEL ROSE, et al.,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

The instant civil rights action was filed pro se by Cyrus R. Sanders, alleging that several

Dauphin County Prison employees violated his civil rights while he was a pretrial detainee in

that institution.  (Doc. Nos. 1, 74.)  Currently pending before the court is Defendants' motion to

dismiss the second amended complaint.  (Doc. No. 113).  For the reasons set forth below,

Defendants' motion will be granted in part and denied in part.

I.     **Background**

A.     **Factual History**

Plaintiff claims that on October 7, 2009, while he was housed at the Dauphin County

Prison ("DCP") as a pretrial detainee, he requested an envelope and writing materials so that he

could file a notice of appeal in a pending legal matter before the October 19, 2009 filing

deadline.  (Doc. No. 74 at 6.)  Although Plaintiff followed this up with several additional

requests, DCP officials failed to provide him with any writing materials before the filing

deadline because of an institutional policy of not issuing any legal or writing materials to

indigent inmates until at least 30 days after commitment.  (Id. at 6-7.)  Because of his inability to

acquire writing materials or an envelope, Plaintiff lost his appellate rights in that case.  (Id.)

Plaintiff also claims that, during the three months he was confined at DCP, he was only

granted access to the prison's full law library on one occasion.  (Id. at 7.)  This restriction

appears to have been a result of Plaintiff's placement in the prison's restricted housing unit ("RHU"), as Plaintiff also alleges that the "satellite" law library provided to RHU inmates was constitutionally inadequate.  (Id. at 8.)  According to Plaintiff, RHU inmates may spend no more than one hour per week in the satellite law library, and must remain handcuffed during that time.  (Id.)  Plaintiff also alleges that the satellite law library "lacks access to state and federal case law" and also "lacks any trained law library staff members to research requested materials or aid inmates in preparing legal documents."  (Id.)  Plaintiff also alleges that he was charged a fee to view copies of unspecified legal materials as well as a fee to submit a hand-written request slip to be added to the list of inmates scheduled to visit the law library.  (Id.)

On October 23, 2009, counselor Jill Cuffaro responded in person to Plaintiff's requests for legal materials and asked Plaintiff whether he still needed legal postage.  (Id. at 9.)  Plaintiff told Cuffaro that his deadline had already passed on October 19.  (Id.)  On October 26, 2009, Cuffaro returned to the RHU and passed out "orientation verification forms" for the inmates to sign, which acknowledged that the inmates had been "given orientation instructions and access to DCP services."  (Id.)  Plaintiff signed "Mickey Mouse" on his form to protest his lack of access to legal materials.  (Id.)  Later that day, Cuffaro returned to the unit irate that someone had signed "Mickey Mouse" on a form.  (Id.)  Plaintiff admitted to signing "Mickey Mouse" and explained that he did it because he thought DCP's legal services was a "Mickey Mouse operation."  (Id.)

Later that day, Plaintiff's cell was searched as part of a "block shake-down/rookie training drill."  (Id. at 10.)  After the rookie officer, Tanya Brant, was finished searching Plaintiff's cell, Officer Emanuel Rose escorted Plaintiff to his cell and ordered Plaintiff to "get

naked" and "show [him] that ass."  (<u>Id.</u>)  Once Plaintiff disrobed and turned his back to Officer

Rose, Rose began punching him in the head, slammed him on a cement desk, and beat him to the

floor.  (<u>Id.</u>)  Other, unknown officers then joined the assault and pinned Plaintiff to the floor

while Rose twisted his arm behind his back and handcuffed him, partially dislocating Plaintiff's

elbow in the process.  (<u>Id.</u>)  Plaintiff was then pulled onto his feet and held in a choke hold by

Rose, who was aided by Officer Throne and another unknown officer.  (<u>Id.</u>)  Plaintiff was then

"shoved around and again beat to the floor on his stomach" by Officer Rose and an unknown

officer.  (<u>Id.</u>)  One of the officers held Plaintiff's cuffed arms behind his back to suspend him

above the floor while two other officers kneed Plaintiff in the sides of his head at least ten times.

(<u>Id.</u> at 10–11.)  Officers Cryder, Brant, and Lehman were present during the attack and did not

intervene.  (<u>Id.</u> at 11.)  After the assault, the officers put Plaintiff's pants back on and dragged

him to another cellblock while singing the "Mickey Mouse" theme song.  (<u>Id.</u>)

 On November 2, 2009, Plaintiff was called to a hearing for a misconduct report that

Officer Rose issued against him, claiming that on October 26, 2009, Plaintiff "flinched

aggressively" at him during the search of his cell.  (<u>Id.</u> at 13.)  Lieutenant Hewitt and Counselor

Cuffaro presided over the hearing and sentenced Plaintiff to sixty days in the RHU.  (<u>Id.</u>)

Plaintiff was never notified of the misconduct charge before the hearing and was thus not given

an opportunity to call any witnesses.  (<u>Id.</u>)

 At some point after this hearing, Plaintiff was informed that six pieces of mail were being

held in the mail room because they lacked proper return addresses.  (<u>Id.</u> at 14.)  Plaintiff was told

that he was not allowed to view the mail and that someone else would have to pick it up.  (<u>Id.</u>)

Plaintiff then sent a large postage-paid envelope to the mail room with a request that the mail be

placed in the envelope and sent to a friend of his who lived several hours away. (Id.) Counselor Cuffaro later returned the envelope to Plaintiff with the stamps "cancelled," and stated that it was against DCP policy to mail the letters for Plaintiff, and that he would instead need to have someone pick them up. (Id.) On December 30, 2009, Plaintiff was transferred to another facility, and was never allowed to retrieve his mail. (Id. at 15.)

**B.  Procedural History**

On June 14, 2010, Plaintiff filed a complaint against DCP and several DCP employees, including various unknown officers, claiming that Defendants had violated his right of access to the courts, interfered with his mail, used excessive force against him, and violated his due process rights in his misconduct hearing. (Doc. No. 1.) This court conducted a preliminary screening of the complaint pursuant to 28 U.S.C. § 1915(e)(2) and found that the complaint violated Federal Rules of Civil Procedure 8 and 20 by failing "to associate each named Defendant with the alleged conduct . . . which violated his rights under the Constitution" and by asserting claims that appeared to be "completely unrelated." (Doc. No. 11 at 3.) This court then ordered Plaintiff to file an amended complaint to cure these deficiencies. (Id. at 5.)

On March 16, 2011, Plaintiff filed his first amended complaint, which was served on the Defendants. (Doc. Nos. 14, 15.) Defendants then moved to dismiss the amended complaint for failure to follow Rules 8 and 20, despite this court's previous order. (Doc. No. 23.) This court, finding that Plaintiff had essentially resubmitted his original complaint with new section headers, dismissed all claims except Count One for failure to follow Rules 8 and 20. (Doc. No. 63.) This court dismissed Count One (Plaintiff's access-to-courts claim) for failure to identify a non-frivolous, arguable underlying claim that was lost due to DCP's failure to provide legal

materials. (<u>Id.</u> at 9–11.)  In its order dismissing the amended complaint, this court also provided

Plaintiff with another opportunity to amend the complaint to restate his access-to-courts claim

and any other claims arising out of the same series of transactions or occurrences.  (<u>Id.</u> at 13.)

Plaintiff filed a second amended complaint on January 28, 2013.  (Doc. No. 74.)

Defendants then moved to strike all but Count One of the second amended complaint for failing

to comply with this court's earlier order, arguing that Plaintiff still failed to associate each named

Defendant with the alleged constitutional violations and that the complaint asserted claims that

were completely unrelated, and moved to dismiss Count One for failure to state a claim.  (Doc.

Nos. 76, 80.)  This court granted the motion, finding that Plaintiff had still failed to comply with

Rule 20 with respect to the majority of his claims, and that Plaintiff also failed to identify a non-

frivolous, arguable legal claim that was lost as a result of DCP's failure to provide legal

materials.  (Doc. No. 90.)

Plaintiff appealed this court's decision to the United States Court of Appeals for the

Third Circuit.  On September 12, 2014, the Third Circuit affirmed this court's judgment in part

and vacated it in part.  (Doc. Nos. 102, 105.)  The court agreed that Plaintiff had failed to

sufficiently plead his access-to-courts claim, but held that his second amended complaint did

comply with Rule 20.  (Doc. No. 105.)

On remand, this court reopened the case and ordered service of the second amended

complaint on Defendants.  (Doc. No. 107.)  Defendants then moved to dismiss the complaint.

(Doc. No. 113.)  The motion has now been fully briefed and is ripe for decision.  For the

following reasons, the motion will be granted in part and dismissed in part.

## II.     Legal Standard—Motion to Dismiss

A sound complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  "Fair notice" in the context of Rule 8 "depends on the type of case—some complaints will require at least some factual allegations to make out a showing that the pleader is entitled to relief."  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) (quotation omitted). "[A] situation may arise where . . . the factual detail in a complaint is so undeveloped that it does not provide a defendant the type of notice of claim which is contemplated by Rule 8."  Id.  A plaintiff must provide more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" to show entitlement to relief.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555) (recognizing that Rule 8 pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"); see also, Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007) (stating that the court is not "compelled to accept unsupported conclusions and unwarranted inferences or a legal conclusion couched as a factual allegation.") (quotations omitted).

A defendant may attack a complaint by a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  In deciding a motion to dismiss under Rule 12(b)(6), a court should "consider only the allegations of the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim."  M & M

Stone Co. v. Pennsylvania, 388 F. App'x 156, 162 (3d Cir. 2010) (quoting Lum v. Bank of Am.,

361 F.3d 217, 221 n. 3 (3d Cir. 2004).  The court is required to accept as true all of the factual

allegations in the complaint, Erickson v. Pardus, 551 U.S. 89, 93 (2007), and all reasonable

inferences permitted by the factual allegations, Watson v. Abington Twp., 478 F.3d 144, 150 (3d

Cir. 2007), and view them in the light most favorable to the plaintiff, Kanter v. Barella, 489 F.3d

170, 177 (3d Cir. 2007).  If the facts alleged are sufficient to "raise a right to relief above the

speculative level" such that the plaintiff's claim is "plausible on its face," a complaint will

survive a motion to dismiss.  Iqbal, 556 U.S. at 663 (citing Twombly, 550 U.S. at 555, 570)

(explaining a claim has "facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged"); see also Phillips, 515 F.3d at 234; Victaulic Co. v. Tieman, 499 F.3d 227, 234 (3d Cir.

2007); Stevenson v. Carroll, 495 F.3d 62, 66 (3d Cir. 2007).  When a complaint contains well-

pleaded factual allegations, "a court should assume their veracity and then determine whether

they plausibly give rise to an entitlement to relief."  Id. at 664.  However, a court is "not bound

to accept as true a legal conclusion couched as a factual allegation."  Id. at 678 (quoting

Twombly, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported

by mere conclusory statements do not suffice."  Id.

When presented with a *pro se* complaint, the court should construe the complaint

liberally and draw fair inferences from what is not alleged as well as from what is alleged.

Dluhos v. Strasberg, 321 F.3d 365, 369 (3d Cir. 2003); Youse v. Carlucci, 867 F. Supp. 317, 318

(E.D. Pa. 1994).  Such a complaint "must be held to less stringent standards than formal

pleadings drafted by lawyers." Erickson,551 U.S. at 94 (quoting Estelle v. Gamble, 429 U.S. 97,

106 (1976)).


**III.    Discussion**

Plaintiff appears to set forth the following claims in his second amended complaint:

1) DCP officials denied Plaintiff his right of access to courts;

2) DCP officers used excessive force against Plaintiff on October 26, 2009;

3) DCP officers unlawfully retaliated against Plaintiff for exercising his First Amendment

right to free speech;

4) DCP officers failed to intervene during the October 26, 2009 assault;

5) Lieutenant Hewitt and Counselor Cuffaro violated Plaintiff's substantive due process

rights by sentencing him to six months in the RHU;

6) Lieutenant Hewitt and Counselor Cuffaro violated Plaintiff's procedural due process

rights during the November 2, 2009 misconduct hearing;

7) DCP mailroom staff retaliated against Plaintiff by withholding several letters from him

and refusing to forward those letters for him; and

8) DCP officials denied Plaintiff an adequate grievance procedure.

(Doc. No. 74 at 6–20.)[1]  As described above, Plaintiff's first claim has already been dismissed by

this court, and that dismissal was upheld by the Third Circuit.  (See Doc. No. 105-1.)

---

[1] Plaintiff groups several of these claims together in the same "counts" in his second amended complaint. (Doc. No. 75 at 9–14.)  This court, in construing the complaint liberally, has separated the "counts" into the several distinct claims that Plaintiff appears to have been trying to assert.

Defendants now move to dismiss the remaining claims.  (Doc. No. 119.)  This court will analyze the arguments for the dismissal of each claim in turn.

### A.      Claim 2—Use of Excessive Force

Pretrial detainees are protected from the excessive use of force by the Fourteenth Amendment's Due Process clause, which prohibits government officials from imposing punishment on those who have not yet been convicted of a crime.  See Bell v. Wolfish, 441 U.S. 520, 535 (1979) ("For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.")  A pretrial detainee may thus be subjected "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution."  Id. at 536–37.

Under this standard, a government actor is prohibited from deliberately using force against a pretrial detainee if that use of force is "objectively unreasonable."  Kingsley v. Hendrickson, ___ U.S. ___, ___, 135 S.Ct. 2466,  2472 (2015).  Whether the use of force is "objectively unreasonable" depends heavily on the context of the individual case at hand. However, the Supreme Court has delineated the following considerations that should be taken into account: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by

the officer; and whether the plaintiff was actively resisting." Id. at 2473 (citing Graham v. Connor, 490 U.S. 386, 396 (1989)).

Defendants concede that Plaintiff has sufficiently pled a claim of excessive use of force against Officers Rose and Cryder. (Doc. No. 119 at 15.) Defendants contend, however, that this claim must be dismissed against the other named Defendants, as they may not be held vicariously liable for the civil rights violations of their employees. (Id. at 15–16.) It is well settled that Plaintiffs may not rely on theories of vicarious liability to hold defendants responsible in a civil rights suit, but instead "must plead that Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676. "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence," but these allegations "must be made with appropriate particularity." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

Plaintiff claims that "Warden DeRose, [the] DCP Board, Commissioners, and solicitors" had actual knowledge of previous assaults on inmates and, by failing properly discipline their officers for those previous assaults, they acquiesced to the assault on Plaintiff. (Doc. No. 74 at 12–13.) However, Plaintiff does not allege any particular facts to support his conclusion that Warden DeRose and other DCP officials knew of and acquiesced to a custom of using excessive force among their officers. Rather, Plaintiff makes conclusory statements alleging that Officer Rose's assault is part of a "continuing practice and custom at DCP." (Id. at 12.) The only support Plaintiff provides for this conclusion is a series of citations to other cases where other prisoners have alleged that officers at DCP used excessive force against them. (Id.) However, none of the cases cited resulted in a judgment in favor of the plaintiffs. See Griggs v. Dauphin

Cnty. Prison, 1:06-cv-0823, 2007 WL 4322432 (M.D. Pa. Dec. 7, 2007) (granting summary

judgment in favor of defendants); Collins v. DeRose, 1:08-cv-0744 (M.D. Pa. Aug. 17, 2010)

(granting summary judgment in favor of defendants); Smith v. Kuzo, 1:08-cv-01277 (M.D. Pa.

Oct. 13, 2011) (claims voluntarily dismissed with prejudice); R.R. v. Stake, 1:10-cv-01422

(M.D. Pa. Mar. 13, 2012) (granting summary judgment in favor of defendants).  As none of these

cases ever resulted in a judgment confirming allegations of the plaintiffs involved, they do not

support Plaintiff's assertion that Warden DeRose and other DCP officials knew of and

acquiesced to a custom of using excessive force among their employees.

Plaintiff's attempts to press his claims against the DCP Board and the Defendants in their

official capacities fail for similar reasons.  Municipalities and other local government bodies can

only be held liable under Section 1983 for the civil rights violations of their employees where

those actions were taken pursuant to a "policy" or "custom" held by the governmental entity.

Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978).  Under this

doctrine, a "policy" refers to "the decisions of [the municipality's] duly constituted legislative

body or of those officials whose acts may fairly be said to be those of the municipality."  Board

of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 403 (1997).  A "custom" refers

to  an act that "has not been formally approved by an appropriate decisionmaker" but is part of a

practice that is "so widespread as to have the force of law."  Id. at 404.  Furthermore, "it is not

enough for a § 1983 plaintiff to identify conduct properly attributable to the municipality," but

instead he must "demonstrate that, through its deliberate conduct, the municipality was the

'moving force' behind the injury alleged."  Id.

Plaintiff alleges no facts to indicate a policy or custom of using excessive force against prisoners at DCP.  Although Plaintiff cites several cases where similar allegations were made against DCP corrections officers, this only goes so far as to show that other prisoners have made similar allegations.  As those cases did not result in judgments in favor of the plaintiffs, this court is not required to accept those claims as true.  Moreover, even if there was a pattern of violent behavior among certain corrections officers, this would be insufficient to show that the DCP Board or the county itself had a custom that was the "moving force" behind the assault on Plaintiff.

For the reasons stated above, Plaintiff has stated a claim for excessive use of force with respect to Officers Rose, Cryder, and other unknown officers.  Furthermore, as Plaintiff has alleged that Officers Brant, Throne, and Lehman were all present during the attack, and that at several points he could not see who was beating him, Plaintiff has also pled facts sufficient to state a claim for excessive use of force against them as well.  (See infra at III.C.)  However, this claim must be dismissed with respect to all other Defendants.

**B.      Claim 3—Retaliation**

Plaintiff next claims that the assault made against him on October 26, 2009, constituted an unlawful retaliation against him for his exercise of his First Amendment right to free speech. (Doc. No. 74 at 9–13.)  In order to state a claim of retaliation, a plaintiff must allege three elements: (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the plaintiff suffered an "adverse action" at the hands of prison officials; and (3) that the constitutionally protected activity was a "substantial or motivating factor" behind the adverse action.  Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001).  In order to qualify as an "adverse

action" under this test, the action taken by the prison officials must be "sufficient to deter a person of ordinary firmness" from continuing to conduct the constitutionally protected activity. Id. (quoting Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)).

Plaintiff claims that the prison officers assaulted him "to maliciously and sadistically punish [him] out of retaliation because he angered Counselor Cuffaro by signing 'Mickey Mouse' on her intake form."  (Doc. No. 74 at 11.)  Plaintiff contends that his signing the document in that fashion was a form of protest for the failure of the prison to provide him with access to legal materials in a timely manner.   However, Defendants contend that Plaintiff has failed to state a First Amendment claim  because he "does not have a Constitutional right to disobey a prison directive by signing 'Mickey Mouse' on an intake form."  (Doc. No. 119 at 21.).

Although the court questions whether Plaintiff has a First Amendment right to sign the document in that manner, without further development of the record the court cannot say there is no viable First Amendment claim.   A prison inmate "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  Pell v. Procunier, 417 U.S. 817, 822 (1974).  "The fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights," and the principle that these rights must be limited by legitimate penological considerations "applies equally to pretrial detainees and convicted prisoners."  Bell v. Wolfish, 441 U.S. 520, 546 (1979) (citing Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 125 (1977)).    Where a prison regulation restricts the constitutional rights of inmates, courts must look at the following factors to determine whether the regulation is

reasonable: 1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest; 2) "whether there are alternative means of exercising the right that remain open to prison inmates;" 3) the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and finally, 4) whether there are "easy alternatives" the prison could implement to accomplish its goals. Turner v. Safley, 482 U.S. 78, 89–90 (1987). This is a fact intensive analysis and more appropriately addressed at the summary judgment stage. On its face, the second amended complaint sufficiently states a claim upon which relief may be granted. Consequently, the Defendants' motion to dismiss the retaliation claim will be denied.

### C.     Claim 4—Failure to Intervene

Plaintiff next claims that Officers Cryder, Brant, Throne, Lehman, and other unknown officers had a reasonable opportunity to intervene in the assault and failed to do so. (Doc. No. 74 at 11.) A corrections officer's "failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so." Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002). As pretrial detainees enjoy even more protection under the Fourteenth Amendment than convicted prisoners do under the Eighth Amendment, the same duty to intervene applies with regard to pretrial detainees as well. Bistrian v. Levi, 696 F.3d 352, 371 (3d Cir. 2012) (applying the Smith standard in a case brought by a pretrial detainee).

Defendants do not squarely address this claim in their motion to dismiss. (See Doc. No. 119 at 13–21.) Regardless, it is clear that Plaintiff has alleged facts sufficient to show that those officers who were present during the assault without directly participating had a reasonable

opportunity to intervene and nonetheless failed to do so.  Thus, Plaintiff has successfully stated a claim against Officers Cryder, Brant, Throne, Lehman, and the unknown officers for failing to intervene in the attack.

To the extent that Plaintiff may have attempted to press this claim against DCP officials who were not present at the attack through theories of failure to train or other forms of vicarious liability, such a claim fails for the same reasons that such a claim fails with respect to Plaintiff's excessive use of force claim.  (See supra at III.A.)

### D.     Claim 5— Violation of Substantive Due Process at Misconduct Hearing

Plaintiff next claims that he was issued a "fraudulent misconduct" by Officer Rose for "flinching aggressively" during the search of his cell block on October 26, 2009.  (Doc. No. 74 at 13.)  Plaintiff alleges that he was not given notice of this misconduct report until his hearing on November 2, 2009.  (Id.)  Plaintiff also claims that Lieutenant Hewitt and Counselor Cuffaro "conspired to preside over the bogus misconduct hearing" and sentenced Plaintiff to sixty days in the RHU because he had angered Cuffaro by signing "Mickey Mouse" on his intake form.  (Id.) Plaintiff claims that he was denied due process by the staging of a "bogus hearing without prior notice."  (Id.)

To determine whether the misconduct hearing violated Plaintiff's substantive due process rights, this court must analyze whether Plaintiff's sentence of 60 days in the RHU qualifies as a "punitive" sentence under the Fourteenth Amendment.  Stevenson v. Carroll, 495 F.3d 62, 67 (3d Cir. 2007).  A given restriction imposed on an inmate "amounts to punishment when there is a showing of express intent to punish on the part of the detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose,

or when the restriction is excessive in light of that purpose." Id. at 68 (quoting Rapier v. Harris, 172 F.3d 999, 1005 (7th Cir. 1999)).

Defendants contend that Plaintiff's own allegations show that his sentence of sixty days in the RHU was imposed for the legitimate governmental purpose of "maintain[ing] institutional security." (Doc. No. 119 at 24.) Plaintiff identifies two possible motives behind the hearing officers' decision to transfer him to the RHU: that Officer Rose charged him with aggressive behavior and that he had signed "Mickey Mouse" on his intake form. (Doc. No. 74 at 13.) Defendants contend that, under either theory, Plaintiff's sentence would clearly be related to maintaining institutional security and thus was not punitive in nature. (Doc. No. 119 at 24.) While Plaintiff's allegations are certainly consistent with Defendants' interpretation, that mere consistency is not sufficient to dismiss this claim at this early stage. See Stevenson, 495 F.3d at 68. These allegations, when construed liberally, also point to a punitive intent on the part of the hearing officers. Plaintiff alleges that Officer Rose fabricated a false report of Plaintiff's aggressive behavior to act as an excuse for the hearing officers to sentence him and that his signing of "Mickey Mouse" on the intake form was the ulterior motive behind the sentence. (Doc. No. 74 at 13.) When combined with the fact that this misconduct hearing was held soon after the assault on Plaintiff by Officer Rose and others, it would appear that, at best, Counselor Cuffaro was using this occasion to punish Plaintiff for a personal grudge held against him. At worst, it could indicate that the entire misconduct hearing was being used to cover up the assault by creating an official record to show that Plaintiff had been behaving aggressively. Under either theory, this sentence would not have been imposed for a legitimate non-punitive concern.

Furthermore, even if this court were to accept Defendants' interpretation of the purpose behind Plaintiff's sentence to the RHU, it is impossible to determine at this stage whether the sentence was excessive in light of that purpose. Plaintiff states that, while in the RHU, he was "denied access to [the] law library, phone, commissary[,] and other needs normally afforded to pretrial inmates." (Doc. No. 74 at 14.) While Plaintiff elsewhere appears to indicate that he had at least some level of law library access (Id. at 8), his allegations are nonetheless sufficient to raise the question of whether his confinement resulted in excessive hardship relative to its purpose. Answering that question would require factual findings regarding the nature of the RHU and the nature of Plaintiff's aggressive behavior that are not possible at this stage. See Stevenson, 495 F.3d at 68–69.

As Plaintiff has successfully stated a claim of a violation of his substantive due process rights, Defendants' motion to dismiss will be denied regarding this claim.

### E.        Claim 6—Violation of Procedural Due Process at Misconduct Hearing

Plaintiff also alleges that he was denied his procedural due process rights at the hearing because he was not given advance notice of the hearing and was thus unable to call witnesses or otherwise gather evidence in his defense. (Doc. No. 74 at 13.) "Due process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334 (1976). In the context of a pretrial detainee who is transferred into more restrictive housing for purely administrative purposes, prison officials need only provide "an explanation of the reason for their transfer as well as an opportunity to respond." Stevenson, 495 F.3d at 70. If, however, the transfer is for "disciplinary purposes," due process requires a

"written notice of the charges" to enable to the inmate to "marshal the facts and prepare a defense." Id. (quoting Wolff. v. McDonnell, 418 U.S. 539, 594 (1974)).

Defendants contend that the hearing was procedurally adequate because "Plaintiff was provided notice, albeit at the hearing, and had a hearing, thus providing him opportunity to be heard." (Doc. No. 119 at 25.) However, this would only be adequate assuming that Plaintiff was transferred for purely administrative reasons, whereas the second amended complaint clearly indicates that his transfer was for disciplinary purposes. (See Doc. No. 74 at 13–14.) Plaintiff thus clearly states a claim for violation of his procedural due process rights. As such, Defendants' motion to dismiss will be denied with respect to this claim.

### F.       Claim 7—Seizure of Plaintiff's Mail

Plaintiff next claims that unknown mailroom staff members violated his constitutional rights by withholding six pieces of mail from him that were sent without return addresses. (Doc. No. 74 at 14.) Plaintiff complains that the mailroom staff should have forwarded the mail to one of his acquaintances if they would not allow him to have it, and also complains that they would not allow him to take the mail with him when he was transferred to another facility. (Id. at 14–15.) Whether a prison's regulation of incoming mail violates the constitutional rights of inmates is determined by using the test first outlined in Turner v. Safley. 482 U.S. 78 (1987); see also Nasir v. Morgan, 350 F.3d 366 (3d Cir. 2003). As explained above, under this test, courts must examine the following four factors: 1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest; 2) "whether there are alternative means of exercising the right that remain open to prison inmates;" 3) the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on

the allocation of prison resources generally;" and finally 4) whether there are "easy alternatives" the prison could implement to accomplish its goals. <u>Turner v. Safley</u>, 482 U.S. 78, 89–90 (1987).

Applying the <u>Turner</u> test to the instant case, it is clear that DCP's policy of not delivering or forwarding incoming mail that contains no return address is constitutional. First, there is a valid, rational connection between DCP's legitimate interest in security and their policy of withholding mail in cases where there is no indication of who sent the mail. Prison officials have a legitimate security interest in restricting inmates from receiving mail from certain sources. <u>See</u> <u>Nasir</u>, 350 F.3d at 372 (holding that prison had a legitimate interest in withholding mail from former prisoner). Those same security concerns would be implicated if the DCP were to forward mail from an unknown sender to an unknown recipient of an inmate's choosing. The requirement that incoming mail must bear a return address is clearly designed to advance this legitimate interest. Similarly, in situations where the institution receives a letter with no return address, it is reasonable for the DCP to require a third party to come in person and take responsibility for the mail.

Having established that the policy is rationally connected to a legitimate government interest, it is also clear that inmates at DCP retain alternative means to receive legitimate correspondence from the outside. To do so, inmates can simply inform potential correspondents that they must place a return address on their envelopes. Next, the impact of accommodating those inmates who insist on either receiving mail without return addresses or having that mail forwarded would be significant. Such an accommodation would require that all such mail be individually inspected to ensure that it contains no prohibited communications. <u>See</u> <u>Turner</u>, 482

U.S. at 93 (finding that, in the context of a regulation barring correspondence between inmates at different institutions, the proposed alternative of monitoring all such correspondence "clearly imposed more than a <u>de minimis</u> cost").  Finally, Plaintiff points to no "easy alternative" to this regulation that would accomplish the same legitimate security goals.

Even accepting as true all of the alleged facts in the complaint, DCP's withholding of Plaintiff's mail clearly passes the <u>Turner</u> test.  As such, Plaintiff has failed to state a claim regarding the withholding of his mail and Defendants' motion to dismiss will be granted as to this claim.

### G.      Claim 8—Inadequate Grievance System

Plaintiff next claims that DCP's "elaborate," "unduly oppressive," and "complicated" grievance procedure provided "no reasonable means to address problems" and thus violated his constitutional rights.  (Doc. No. 74 at 15.)  Defendants contend that Plaintiff has no constitutional right to a grievance procedure and, as such, he has failed to state a claim in this regard.  This court agrees.

Access to a prison grievance procedure is not a constitutional right.  <u>See, e.g.</u>, <u>Heleva v. Kramer</u>, 214 F. App'x 244, 247 (3d Cir. 2007) (citing <u>Massey v. Helman</u>, 259 F.3d 641, 647 (7th Cir. 2001)) ("Prisoners do not have a constitutional right to prison grievance procedures.").  Because Plaintiff had no constitutional right to a prison grievance procedure, his allegations regarding the byzantine nature of DCP's grievance system fails to state a legally cognizable claim.  Thus, Defendants' motion to dismiss must be granted with respect to this claim.

### IV.    <u>Conclusion</u>

For the reasons given above, Defendants' motion to dismiss will be granted in part and denied in part.  Plaintiff's claim of excessive use of force will be dismissed with respect to all Defendants except Officers Rose, Cryder, Brant, Throne, Lehman, and the unknown officers. Similarly, Plaintiff's claim of a failure to intervene will be dismissed as to all defendants except Officers Cryder, Brant, Throne, Lehman, and the unknown officers.  Plaintiff's claims of seizure of personal mail, and inadequate grievance procedure will also be dismissed.  Plaintiff's claim of substantive and procedural due process violations against Lieutenant Hewitt and Counselor Cuffaro resulting from the November 2, 2009, hearing will not be dismissed.

An appropriate order will issue.