**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CYRUS R. SANDERS,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:10-CV-01241** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **EMANUEL ROSE**, <u>et al.</u>, | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

The instant civil rights action was filed by <u>pro</u> <u>se</u> Plaintiff, Cyrus R. Sanders, pursuant to 42 U.S.C § 1983, alleging that several Dauphin County Prison ("DCP") employees violated his civil rights while he was a pretrial detainee at that institution. (Doc. Nos. 1, 74.) Currently pending before the Court is Defendants' motion for summary judgment. (Doc. No. 159). For the reasons set forth below, Defendants' motion will be granted.

**I.    BACKGROUND**

**A.    Procedural History**

On June 14, 2010, Plaintiff filed a complaint against DCP and several DCP employees, including various unknown officers, claiming that Defendants had violated his right of access to the courts, interfered with his mail, used excessive force against him, and violated his due process rights in his misconduct hearing. (Doc. No. 1.) This Court conducted a preliminary screening of the complaint pursuant to 28 U.S.C. § 1915(e)(2), and ordered Plaintiff to file an amended complaint to correct certain pleading deficiencies. (<u>Id.</u> at 5.)

On March 16, 2011, Plaintiff filed his first amended complaint, which was served on the Defendants. (Doc. Nos. 14, 15.) Defendants promptly moved to dismiss the amended complaint for failure to adhere to Rules 8 and 20 of the Federal Rules of Civil Procedure (Doc. No. 23), which this Court ultimately granted (Doc. No. 63). Specifically, the Court dismissed Plaintiff's

access-to-the-courts claim (Count One), for failure to identify a non-frivolous, arguable underlying claim that was lost due to DCP's refusal to provide legal materials, and dismissed all remaining claims for failure to adhere to the strictures of Rules 8 and 20. (Id. at 9–11.) In its Order dismissing the amended complaint, however, the Court granted Plaintiff leave to amend his pleading to restate his access-to-courts claim and to assert any other claims arising out of the same series of transactions or occurrences. (Id. at 13.)

Plaintiff filed a second amended complaint on January 28, 2013. (Doc. No. 74.) Defendants then moved to strike all but Count One of the second amended complaint for failure to comply with this Court's previous Order, arguing that Plaintiff still failed to associate each named Defendant with the alleged constitutional violations and that the complaint asserted claims that were completely unrelated, and moved to dismiss Count One for failure to state a claim. (Doc. Nos. 76, 80.) The Court granted the motion to dismiss, again finding that Plaintiff failed to comply with Rule 20 with respect to the majority of his claims, and failed to aver sufficient facts of a non-frivolous, arguable legal claim that was lost as a result of DCP's failure to provide legal materials. (Doc. No. 90.)

Plaintiff appealed this Court's decision to the United States Court of Appeals for the Third Circuit. On September 12, 2014, the Third Circuit affirmed this Court's judgment in part and vacated it in part. (Doc. Nos. 102, 105.) The Third Circuit agreed that Plaintiff had failed to sufficiently plead his access-to-courts claim, but held that his second amended complaint did comply with Rule 20. (Doc. No. 105.)

On remand, this Court reopened the case and ordered service of the second amended complaint on Defendants. (Doc. No. 107.) Defendants then moved to dismiss the second amended complaint. (Doc. No. 113.) On February 8, 2016, this Court granted in part and denied

in part Defendants' motion to dismiss. (Doc. No. 134.) This Court also issued a Clarification

Order on May 17, 2016, providing that the only claims remaining in this case are the excessive

force and failure-to-intervene claims against Defendants Rose, Cryder, Throne, and unknown

Officers, and the procedural and substantive due process claims against Defendants Hewitt and

Cuffaro. (Doc. No. 140.)

On June 17, 2016, the remaining Defendants filed an answer to the second amended

complaint. (Doc. No. 144.) After a period of discovery, Defendants filed the instant motion for

summary judgment on February 7, 2017 (Doc. No. 158), along with a brief in support (Doc. No.

159), statement of facts (Doc. No. 160), and a number of affidavits. (Doc. No. 158). On

February 23, 2017, Plaintiff filed his oppositional brief (Doc. No. 162), but did not file an answer

to Defendants' statement of facts. Thereafter, Defendants filed a reply brief (Doc. No. 163).

### B.       Allegations of the Second Amended Complaint

Plaintiff claims that on October 7, 2009, while he was housed at DCP as a pretrial

detainee, he requested an envelope and writing materials so that he could file a notice of appeal

in a pending legal matter before the October 19, 2009 filing deadline. (Doc. No. 74 at 6.)

Although Plaintiff followed this up with several additional requests, DCP officials failed to

provide him with any writing materials before the filing deadline because of an institutional

policy of not issuing any legal or writing materials to indigent inmates until at least 30 days after

commitment. (Id. at 6-7.) Because of his inability to acquire writing materials or an envelope,

Plaintiff lost his appellate rights in that case. (Id.)

Plaintiff also claims that, during the three months he was confined at DCP, he was only

granted full access to the prison's law library on one occasion. (Id. at 7.) This restriction

appears to have been a result of Plaintiff's placement in the prison's restricted housing unit

("RHU"), as Plaintiff also alleges that the "satellite" law library provided to RHU inmates was constitutionally inadequate. (<u>Id.</u> at 8.) According to Plaintiff, RHU inmates may spend no more than one hour per week in the satellite law library, and must remain handcuffed during that time. (<u>Id.</u>)

On October 23, 2009, counselor Jill Cuffaro responded in person to Plaintiff's requests for legal materials and asked Plaintiff whether he still needed legal postage. (<u>Id.</u> at 9.) Plaintiff told Cuffaro that his deadline had already passed on October 19. (<u>Id.</u>) On October 26, 2009, Cuffaro returned to the RHU and passed out "orientation verification forms" for the inmates to sign, which acknowledged that the inmates had been "given orientation instructions and access to DCP services." (<u>Id.</u>) Plaintiff signed "Mickey Mouse" on his form to protest his lack of access to legal materials. (<u>Id.</u>) Later, Cuffaro returned to the unit irate that someone had signed "Mickey Mouse" on a form. (<u>Id.</u>) Plaintiff admitted to signing "Mickey Mouse" and explained that he did it because he thought DCP's legal services was a "Mickey Mouse operation." (<u>Id.</u>)

Subsequently, Plaintiff's cell was searched as part of a "block shake-down/rookie training drill." (<u>Id.</u> at 10.) After the rookie officer, Tanya Brant, was finished searching Plaintiff's cell, Officer Emanuel Rose escorted Plaintiff to his cell and ordered Plaintiff to "get naked" and "show [him] that ass." (<u>Id.</u>) Once Plaintiff disrobed and turned his back to Officer Rose, Rose began punching him in the head, slammed him on a cement desk, and beat him to the floor. (<u>Id.</u>) Other unknown officers then joined the assault and pinned Plaintiff to the floor while Rose twisted his arm behind his back and handcuffed him, partially dislocating Plaintiff's elbow in the process. (<u>Id.</u>) Plaintiff was then pulled onto his feet and held in a chokehold by Rose, who was aided by Officer Throne and another unknown officer. (<u>Id.</u>) Plaintiff was then "shoved around and again beat to the floor on his stomach" by Officer Rose and an unknown officer. (<u>Id.</u>) One

of the officers held Plaintiff's cuffed arms behind his back to suspend him above the floor while two other officers kneed Plaintiff in the sides of his head at least ten times. (Id. at 10–11.) Officers Cryder, Brant, and Lehman were present during the attack and did not intervene. (Id. at 11.) After the assault, the officers put Plaintiff's pants back on and dragged him to another cellblock while singing the "Mickey Mouse" theme song. (Id.)

On November 2, 2009, Plaintiff was called to a hearing for a misconduct report that Officer Rose issued against him, claiming that on October 26, 2009, Plaintiff "flinched aggressively" at him during the search of his cell. (Id. at 13.) Lieutenant Hewitt and Counselor Cuffaro presided over the hearing and sentenced Plaintiff to sixty (60) days in the RHU. (Id.) Plaintiff alleges that he was never notified of the misconduct charge before the hearing and was thus not given an opportunity to call any witnesses. (Id.)

## C.    Statement of Undisputed Facts[1]

Plaintiff claims that on October 7, 2009, while he was housed at the Dauphin County Prison as a pretrial detainee, he requested an envelope and writing materials so that he could file a notice of appeal in a pending legal matter before the October 19, 2009 filing deadline. (Doc. No. 74 at 6.; Doc. No. 160 ¶¶ 1, 2.) Plaintiff alleges that DCP officials failed to provide him with any writing materials before the filing deadline because of an institutional policy of not

---

[1] Middle District of Pennsylvania Local Rules of Court provide that in addition to filing a brief in response to the moving party's brief in support, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . , as to which it is contended that there exists a genuine issue to be tried." See M.D. Pa. LR 56. 1. The Rule further states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. See id. Unless otherwise noted, the factual background herein derives from Defendants' Rule 56.1 statement of material facts. (See Doc. No. 160.) Plaintiff did not file a response to Defendants' statement of material facts. The Court accordingly deems the facts set forth by Defendants to be undisputed. See Local Rule 56.1; Fed. R. Civ. P. 56(e)(2).

issuing any legal or writing materials to indigent inmates until at least 30 days after commitment. (Id.)  Because of his inability to acquire writing materials or an envelope, Plaintiff lost his appellate rights in that case.  (Id.)

Counselor Jill Cuffaro passed out "orientation verification forms" for the inmates to sign, which acknowledged that the inmates had been "given orientation instructions and access to DCP services."  (Doc. No. 160 ¶ 4.)  Plaintiff signed "Mickey Mouse" on his form to protest his lack of access to legal materials.  (Id. ¶ 5.)  Later that day, Cuffaro returned to the unit and Plaintiff admitted to signing "Mickey Mouse" on the form and explained that he did it because he thought DCP's legal services was a "Mickey Mouse operation."  (Id. ¶ 6.)

On October 26, 2009, Plaintiff's cell was searched as part of a program to eliminate contraband and further the safety level of inmates and staff.  (Id. ¶¶ 7, 8.)   At the time of the search, Defendant Rose was teaching classes to correctional officer trainees and was asked to assist in the cell search of Plaintiff.  (Id. ¶¶ 11, 12.)  Approximately ten (10) to fifteen (15) staff and trainees were present at the time of Plaintiff's cell search.  (Id. ¶ 13.)  Plaintiff was removed from his cell and handcuffed to the stair rail for the search.  (Id. ¶¶ 14, 15.)  Plaintiff became highly irritated, belligerent, and aggressive as he was removed from his cell (Id. ¶ 15), and was yelling and screaming obscenities to staff and trainees, and using disrespectful language the entire time during the search.  (Id. ¶ 16.)

Once the cell search was completed, Plaintiff was escorted back into his cell (Id. ¶ 19), at which Plaintiff was overheard saying: "it looks like pigs were rutting in here."  (Id. ¶ 20.)  Once inside the cell, per routine, Plaintiff was ordered to strip and assume a strip search position.  (Id. ¶ 22.)  Plaintiff continued his aggressive and disruptive behavior, verbally assaulting staff while beginning to undress.  (Id. ¶ 23.)  Defendants provide that per procedure, prisoners being strip

searched are to hand each article of clothing to the Correctional Officer performing the search (Id. ¶ 25), but Plaintiff refused to hand his clothing to Defendant Rose, and threw them in the direction of Rose and toward Plaintiff's bed. (Id. ¶ 26.)

Continuing his aggressive behavior and verbal disrespect, Plaintiff stated "how's that?" when proceeding to bend over to show his buttocks. (Id. ¶ 29.) In the Incident Report from this event, Defendant Rose provides that while Plaintiff was being strip searched, Plaintiff flinched towards him in an act of aggression. (Id. ¶ 44.) Defendants Rose and Throne immediately took Plaintiff to the ground in response to his quick and aggressive move towards Defendant Rose. (Id. ¶ 30.) A struggle between Defendants Rose, Throne, and Plaintiff ensued because Plaintiff refused to provide his hands for handcuffing. (Id. ¶ 31.) Once Plaintiff was finally handcuffed, he was removed from his cell and taken to a separate cell for disciplinary reasons. (Id. ¶ 32.) These events took place in less than forty-five (45) seconds. (Id. ¶ 33.)

While waiting for medical staff, Plaintiff was observed intentionally rubbing his face back and forth on the floor, presumably to enhance his injuries. (Id. ¶ 37.) Medical staff examined Plaintiff and took pictures of his face and body. (Id. ¶¶ 34, 35.) Plaintiff did not require any further medical treatment and was not taken to the hospital. (Id. ¶ 38.) During this time, Plaintiff was handed a Disciplinary Report by Correctional Officer Hosler at approximately 1:00 p.m. for violation of prison rules and regulations. (Id. ¶¶ 36, 39, 45.) The Incident Report was signed by Defendant Rose. (Id. ¶ 45.) Plaintiff had a hearing on November 10, 2009, and represented himself. (Id. ¶¶ 40, 41.) During the disciplinary proceeding, Plaintiff stated that "They tore the cell up and I'm a farm boy" and further stated that it "looks like pigs were rutting here. I didn't flinch on nobody." (Id. ¶ 46.) The Board found Plaintiff guilty and he was given sixty (60) days discipline in the RHU. (Id. ¶ 51.)

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Co., 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The party opposing

the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323. See Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988). In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. Id. (citations omitted). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts et forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a pro se litigant. These rules apply with equal force to all parties. See Sanders v. Beard, No. 09-CV-1384, 2010 U.S. Dist. LEXIS, *15 (M.D. Pa. July 20, 2010) (pro se parties "are not excused from complying with court orders and the local rules of court"); Thomas v. Norris, No. 02-CV-01854, 2006 U.S. Dist. LEXIS 64347, *11 (M.D. Pa. Sept. 8, 2006) (pro se parties must follow the Federal Rules of Civil Procedure).

## III.    DISCUSSION

Defendants seek an entry of summary judgment on the following grounds: (1) Defendants are entitled to qualified immunity; (2) there are no genuine issues of material fact to support Plaintiff's excessive force claim; (3) there are no genuine issues of material fact to support Plaintiff's failure-to-intervene claim; and (4) there are no genuine issues of material fact to support Plaintiff's procedural and substantive due process claims.  (Doc. No. 159.)  The Court addresses each of these arguments in turn.

### A.    Eighth Amendment Excessive Force Claim

Defendants' seek the dismissal of Plaintiff's excessive force claim on the grounds that de minimis force was used and justified in order to subdue a hostile and noncompliant Plaintiff. The Eighth Amendment's protection against cruel and unusual punishment is the "primary source of substantive protection in cases where an inmate challenges a prison official's use of force as excessive and unjustified."  Brooks v. Kyler, 204 F.3d 102, 105 (3d Cir. 2000).  The test for whether one has an excessive force claim is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)).

The issue of whether excessive force was used is one which, in proper circumstances, can be determined as a matter of law.  In such cases, summary judgment is appropriate when "it appears that the evidence, viewed in the light most favorable to the plaintiff, will [not] support a reliable inference of wantonness in the infliction of pain."  Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Whitley, 475 U.S. at 322).  In making this determination, courts are tasked with evaluating the following  Whitley factors: "(1) the need for the application of force;

(2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response." Id. (citing Whitley, 475 U.S. at 321); see also Brooks, 204 F.3d at 102. The United States Supreme Court has stated:

> [W]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated . . . whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury."

Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (quoting Hudson v. McMillian, 503 U.S. 1 (1992)).

When considering such claims, the reasonableness of a particular use of force is often dependent upon factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396-97 (1989); see Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir. 2000) ("[E]ven if we concede [that an inmate] has established at most that prison officials over-reacted to the disturbance that he caused . . . , any such over-reaction would still fall short of supporting a finding that prison officials acted 'maliciously and sadistically to cause harm.'") Additionally, de minimis use of physical force does not qualify as excessive force unless the force is "repugnant to the conscience of mankind." Brooks, 204 F.3d at 107 (citing Hudson, 503 U.S. at 6; see generally Wilkins, 559 U.S. 34 (2010) (clarifying that de minimis force is the dispositive issue, not de minimis injury). Indeed, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Hudson, 503 U.S. at 9.

With these legal tenets in mind, the Court turns to its consideration of the <u>Whitley</u> factors to resolve the "core judicial inquiry" of "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," <u>Hudson</u>, 503 U.S. at 7, in conjunction with Defendants' statement of material facts and supporting affidavits.

With regard to the need for application of force, Defendants submit voluminous affidavits by those Defendants present during the cell and strip search of Plaintiff. These affidavits provide that Defendants were presented with a verbally aggressive and noncompliant Plaintiff during the strip search. (<u>See</u> Doc. No. 158-7 – 158-14, Exhibits C-J.) Specifically, Defendant Rose and Defendant Throne provide that despite Rose's order to hand Plaintiff's articles of clothing to Rose, Plaintiff threw his clothes in the direction of Rose and toward Plaintiff's bed. (<u>Id.</u> Ex. B, Plaintiff's Dep., p. 69, Ex. D, Rose Aff., Ex. E, Throne Aff.) Rose next describes in his affidavit that while Plaintiff was removing his articles of clothing, he made an aggressive move "i.e. a 'flinch' toward me . . . ." (<u>Id.</u> Ex. D ¶ 22.) Throne confirms this account in his affidavit by providing "[s]uddenly and without warning, [Plaintiff] made a quick motion and threw clothes toward Correctional Officer Rose during the strip search process . . . . " (<u>Id.</u> Ex. E ¶ 21.) As a result, Rose and Throne took Plaintiff to the ground in response to Plaintiff's quick and aggressive move towards Rose. (<u>Id.</u> Ex. D ¶ 23, Ex. E ¶ 22.)

The only evidence Plaintiff points to in an effort to create a genuine dispute of material fact are two declarations of inmates attached to his brief in opposition to Defendants' motion for summary judgment. The first declaration is from inmate Chance Bonner who provides that his cell was directly next to Plaintiff's and that he heard a commotion in Plaintiff's cell and saw several guards rush towards Plaintiff's cell. (Doc. No. 162-1, p. 4.) The second declaration is from inmate Eddy Petitto. (<u>Id.</u>, p. 6.) Petitto's declaration provides that he was still handcuffed

outside of his cell when Plaintiff was taken back into his cell. (Id.) Petitto further provides that he heard Plaintiff being told to strip and that as soon as he turned his back to the officers, they began beating him. (Id.) However, as pointed out by Defendants, these declarations provide nothing more than what these individuals allegedly heard and, in fact, are not inconsistent with Defendants' account of the incident. These declarations contain no visual account of the interaction that took place inside of Plaintiff's cell. Therefore, in considering this first factor, the Court concludes that there was some need for the application of force as a result of Plaintiff's quick and aggressive movement towards Rose.

In considering the second factor, the Court looks at the relationship between the need and amount of the force used. In making this inquiry, the Court is reminded that the reasonableness of a particular use of force is often dependent upon factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396-97. Here Defendants were confronted with an aggressive and noncompliant Plaintiff within the small confines of Plaintiff's cell. Despite direct orders given by Rose to hand him Plaintiff's clothing, Plaintiff threw his clothing in the direction of Rose and onto Plaintiff's bed. (Doc. No. 158, Ex. D, Rose Aff., Ex. E, Throne Aff.) Dealing with a verbally abusive and aggressive Plaintiff who was disobeying orders from Rose during the strip search, the situation quickly escalated when Plaintiff threw his clothes toward Rose while simultaneously making a quick and aggressive movement, or "flinch," towards him during the strip search process. (Id. Ex. E ¶ 21.) Accordingly, the Court finds that this factor weighs in support of Defendants and that the force applied to secure Plaintiff during the search was proportionate to the need to restrain Plaintiff and effectuate Plaintiff's compliance with direct orders.

The Court next considers the extent of the injury inflicted. While significant or serious injury is not required to support an excessive force claim, <u>Hudson v. McMillian</u>, 503 U.S. 1, 4 (1992), "[a]n inmate who complains of a 'push or shove' that causes no discernable injury almost certainly fails to state a valid excessive force claim." <u>Wilkins v. Gaddy</u>, 599 U.S. 34, 38 (2010) (citation omitted). Here the documented injuries to Plaintiff include redness to Plaintiff's face near his eye. (Doc. No. 158, Ex. H ¶ 9; Ex. L.) However, Defendants provide in the attached affidavits that while waiting for medical to arrive, Plaintiff was observed rubbing his face on the concrete floor of the cell in an attempt to "embellish, worse[n], or create injuries to his face and eye." (Doc. No. 158, Ex. H ¶ 9.)

Upon review of Plaintiff's injuries, including the photographs appended to Defendants' motion (Doc. No. 158, Ex. L), the Court concludes that the redness around Plaintiff's eye is <u>de minimis</u> in nature. Moreover, it appears from the record that Plaintiff did not require any further medical treatment and Plaintiff was not taken to the hospital. (<u>Id</u>. Ex. B, pp 90-92.); <u>See</u> <u>Luong v. Hatt</u>, 979 F. Supp. 481, 485-86 (N.D. Tex. 1997) (finding that minor abrasions on the forearm and chest, a contusion with slight swelling of the jaw, a swollen wrist, cuts on the face and tongue, and a bloody nose were only <u>de minimis</u> injuries because they were the types of injuries that would not require "a free world person to visit an emergency room, or have a doctor attend to, give an opinion, diagnosis and/or medical treatment for the injury"); <u>Bynum v. Thiroway</u>, No. 3:CV:06-2272, 2008 WL 2704619, at *5 (M.D. Pa. July 7, 2008) (granting summary judgment in favor of Defendants on excessive force claim where Plaintiff suffered head laceration requiring only a few sutures); <u>Hardwick v. Packer</u>, No. 1:12-CV-1936, 2013 WL 4016495, at *14-15 (M.D. Pa. Aug. 6, 2013) (granting summary judgment in favor of Defendants on excessive force claim where Plaintiff suffered 2.5 cm laceration to his left eyebrow and had to

be sealed using dermabond). The Court is cognizant of Plaintiff's unsupported assertion in his brief in opposition that he required physical therapy to regain the use of his shoulder and elbow. (Doc. No. 152, p. 9.) However, Plaintiff has produced no medical records or any other documentation to support this assertion. Accordingly, the Court finds that this factor also weighs in favor of granting summary judgment for Defendants.

The fourth factor the Court must consider is the extent of the threat and safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them. Giles, 571 F.3d at 326. Here, Defendants were confronted with an aggressive and noncompliant Plaintiff within the small confines of Plaintiff's cell, and despite orders given by Rose to hand him Plaintiff's clothing, Plaintiff threw his clothing in the direction of Rose while simultaneously making a quick and aggressive movement, or "flinch," towards him during the strip search. (Doc. No. 158, Ex. D, Rose Aff., Ex. E, Throne Aff.) The Court concludes that there was a reasonable perception of a threat to the safety of staff and inmates. It was reasonable for Rose to perceive that allowing Plaintiff to aggressively move toward him posed a threat to his own safety and the safety of other inmates and staff in the immediate area. See Abdulla v. Hess, No. 3:15-924, 2016 WL 1023575, at *8 (M.D. Pa. March 15, 2016); Mitchell v. Dodrill, No. 1:CV-08-01414, 2011 WL 111746, at *4 (M.D. Pa. Jan. 13, 2011) (granting summary judgment in favor of Defendants on Plaintiff's use of force claim where Plaintiff refused to comply with Defendants' orders and only then used force necessary to restore order and safety); See Young v. Coleman, No. 10-CV-786, 2012 WL 2327917, at *10 (W.D. Pa. Apr. 16, 2012) (granting summary judgment in favor of Defendant on Plaintiff's use of excessive force claim because: Defendant perceived the plaintiff to be a threat as he was yelling, thrashing his hands around, disobeying orders, and physically resisting; the situation could have easily escalated into

something much more serious; and the other officers tried to temper the severity of their response by giving repeated verbal commands that Plaintiff ignored).  Thus, this factor also weighs in favor of granting summary judgment in Defendants' favor.

The final factor that the Court considers is the effort made to temper the severity of a forceful response.  Again, Defendants' affidavits provide that a split second decision was made to bring Plaintiff to the ground after a hostile and noncompliant Plaintiff made an aggressive movement towards Rose.  (Doc. No. 158, Ex. D, Rose Aff., Ex. E, Throne Aff.)  Even when on the ground, Plaintiff struggled with Defendants to allow them to handcuff him.  (Doc. No. 158, Ex. D, ¶ 23.)  Thus, Plaintiff's actions posed an immediate threat requiring an immediate response, and there was no time to attempt to negotiate or reason with Plaintiff.  See Abdullah, 2016 WL 1023575, at *8 ("[A]s to whether an effort was made to temper [the correctional officer's] response, [plaintiff's] actions posed an immediate threat requiring an immediate response, and there was no time to attempt to negotiation or reason with [plaintiff].").  However, the Court again notes that the force used was de minimis and the split-second decision to use force in order to subdue the noncompliant and aggressive Plaintiff was made by Rose only after Plaintiff made an aggressive movement towards him.  See Graham, 490 U.S. at 396-97 (holding that the reasonableness of a particular use of force is often dependent upon factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"); see also Anderson v. Sullivan, 702 F. Supp. 424, 426 (S.D.N.Y. 1988) (finding that corrections officer's pulling inmate's arms behind back, lifting them up and forcing inmate's face into cell bars was de minimis force).

Accordingly, the Court finds that the force used in taking Plaintiff to the ground and handcuffing him was de minimis and adequately tempered in order to retain control over

Plaintiff, despite Plaintiff's noncompliance. Thus, this final factor also weighs in favor of Defendants.

Examining the particular facts of this case under the <u>Whitley</u> factors, the Court finds that no reasonable trier of fact could conclude that Defendants' application of force was excessive in violation of Plaintiff's Eighth Amendment rights. The force was restrained and resulted in <u>de minimis</u> harm to Plaintiff. Accordingly, summary judgment on Plaintiff's Eighth Amendment claim will be granted in favor of Defendants.

### B. Qualified Immunity

Even if the evidence supported a finding of more than <u>de minimis</u> physical injury, Defendants are entitled to qualified immunity from these claims for damages. In order to establish a civil rights claim, Plaintiff must show the deprivation of a right secured by the United States Constitution or laws of the United States. However, satisfying these elements alone does not guarantee that Plaintiff is entitled to recover damages from the public officials. Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999); <u>see also</u> <u>Pearson v. Callahan</u>, 55 U.S. 223 (2009). This qualified immunity doctrine provides officials performing discretionary functions not only a defense to liability, but also "immunity from suit." <u>Crouse v. S. Lebanon Twp.</u>, 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (citations omitted). The Supreme Court in <u>Pearson</u> provided that qualified immunity:

> Balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

<u>Pearson</u>, 555 U.S. at 231 (citation omitted).

Application of qualified immunity implicates two distinct inquiries.  The first evaluates whether the defendant violated a constitutional right.  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001), <u>abrogated in part by</u> <u>Pearson</u>, 555 U.S. 223; <u>Curley v. Klem</u>, 499 F.3d 199, 206 (3d Cir.2007); <u>Williams v. Bitner</u>, 455 F.3d 186, 190 (3d Cir.2006).  If the defendant did not commit a constitutional infraction, the court must dispose of the claim in the defendant's favor.  <u>Saucer</u>, 533 U.S. at 201.  If the defendant committed a constitutional violation, the second inquiry assesses whether the right in question was "clearly established" at the time the defendant acted.  <u>Pearson</u>, 555 U.S. at 232; <u>Saucier</u>, 533 U.S. at 201 - 02.  A right is "clearly established" if a reasonable state actor under the circumstances would have known that his or her conduct impinged upon constitutional mandates.  <u>Pearson</u>, 555 U.S. at 232.  Further, the Third Circuit has stated that "a right is clearly established for the purposes of qualified immunity when its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  <u>Hubbard v. Taylor</u>, 538 F.3d 229, 236 (3d Cir. 2008) (quoting <u>Williams</u>, 455 F.3d at 191).  This standard "'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'"  <u>Hubbard</u>, 538 F.3d at 236 (quoting <u>Gilles v. Davis</u>, 427 F.3d 197, 203 (3d Cir. 2005)).  The court is not required to conduct the inquiries sequentially, <u>Pearson</u>, 555 U.S. at 239-40, and it may eschew difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted.  <u>Pearson</u>, 555 U.S. at 239.

Applying these tenets, the Court finds that Defendants are entitled to qualified immunity as to the excessive force claim.  The record does not evince anything that would have alerted

Defendants that their actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999). A review of numerous cases in this field make it clear that such a right was not "clearly established," in this specific factual context where Defendants, confronted with a noncompliant and aggressive Plaintiff, who was violating prison rules and orders, was taken to the ground in order to control him and because he posed an immediate threat. See, e.g., Abdullah, 2016 WL 1023575, at * 8 (finding that officer's quick decision to use force to subdue plaintiff in response to plaintiff displaying acts of imminent violence does not violate the Eighth Amendment). Stated another way, even if a jury were to conclude that Plaintiff's constitutional rights were violated by being subjected to force by Defendants, the Court could not find that a reasonable officer in Defendants' position would have known "beyond debate" that using such de minimis force on Plaintiff who was noncompliant, posed an imminent threat and made an aggressive move towards Defendant, constituted excessive force. Therefore, these officials are entitled to qualified immunity from damages in this case.

### C.       Failure-to-Intervene Claim

Prison officials have a duty to protect prisoners from violence at the hands of others. Farmer v. Brennan, 511 U.S. 825, 833 (1994). Prison officials and employees may be liable for failing to protect an inmate from the use of excessive force if they are deliberately indifferent to a substantial risk of serious harm to the inmate. Id. at 834. To plead a viable Eighth Amendment failure to protect claim, a plaintiff must plead facts raising a reasonable inference of (1) a substantial risk of serious harm, (2) the defendant's deliberate indifference to that risk, and (3) causation. See Hamilton v. Leavy, 117 F.3d 742, 747 (3d Cir.1997). The plaintiff must show, among other things, that the guard was subjectively aware of a substantial risk of serious harm.

Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014). A guard's subjective awareness has two elements: "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

Plaintiff claims that Defendants Cryder, Throne, and Unknown Officers failed to protect him from the excessive force of Defendant Rose. The Court notes that although "legally distinct, the fate of plaintiff's failure to intervene claim is closely linked to that of [the] excessive force claim since, by definition, if there was no excessive force then there can be no failure to intervene." Abdullahi v. City of Madison, 423 F.3d 763, 767-78 (7th Cir. 2005); Jackson v. Mills, No. 96-3751, 1997 WL 570905, at *5 n.10 (E.D. Pa. Sept. 4, 1997). Because the Court is granting Defendants' motion for summary judgment on the issue of excessive force, the failure to intervene/protect claim must necessarily fail. See Lora-Pena v. Denney, 760 F. Supp. 2d 458, 468 (D. Del. 2011); Santiago v. Fields, No. 05-4884, 2009 WL 693642, at *4 (E.D. Pa. Mar. 12, 2009) ("For there to be a failure to intervene, it follows that 'there must exist an underlying constitutional violation.'") (quoting case omitted).[2]

### D. Procedural and Substantive Due Process Claims

Defendants also move for summary judgment on the remaining procedural and substantive due process claims. Plaintiff claims that he was issued a "fraudulent misconduct" by Officer Rose for "flinching aggressively" during the search of his cell block on October 26, 2009. (Doc. No. 74 at 13.) Plaintiff also alleges that he was not given notice of this misconduct report until his hearing. (Id.) Plaintiff claims that Lieutenant Hewitt and Counselor Cuffaro "conspired to preside over the bogus misconduct hearing" and sentenced Plaintiff to sixty (60)

---

[2] Moreover, the record does not demonstrate the personal involvement of Defendant Cryder as she was not present within the cell during the strip search. (Doc. No. 159, p. 21.)

days in the RHU because he had angered Cuffaro by signing "Mickey Mouse" on his intake form.  (Id.)  Plaintiff claims that he was denied due process by the staging of a "bogus hearing without prior notice."  (Id.)

In response, Defendants submitted the incident report as well as the affidavit of Correctional Officer Hosler who attests that he delivered the signed report to Plaintiff at approximately 1:00 p.m. on October 26, 2009, less than an hour after the incident underpinning this case took place.  (Doc. No. 158, Ex. H ¶ 10, Ex. K.)

　　　　1.　　Substantive Due Process

The Court must determine whether Plaintiff's sentence of sixty (60) days in the RHU qualifies as a "punitive" sentence under the Fourteenth Amendment.  Stevenson v. Carroll, 495 F.3d 62, 67 (3d Cir. 2007).  Unlike sentenced inmates, pretrial detainees have a liberty interest in being free from punishment prior to conviction under the Due Process Clause.  Bell v. Wolfish, 441 U.S. 520, 535-36 (1979).  In determining whether a pretrial condition rises to the level of punishment, the Court examines whether it is imposed for the purpose of punishment or is "an incident of some other legitimate governmental purpose."  Hubbard v. Taylor, 399 F.3d 150, 158 (3d Cir. 2005) (quoting Bell, 441 U.S. at 538-39)).  A given restriction imposed on an inmate "amounts to punishment when there is a showing of express intent to punish on the part of the detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose."  Stevenson, 495 F.3d at 68 (quoting Rapier v. Harris, 172 F.3d 999, 1005 (7th Cir. 1999)).

Given this framework, courts engage in a two-step inquiry to determine whether a pretrial detainee's confinement conditions violate his substantive due process rights.  Union Cnty. Jail

Inmates v. Di Buono, 713 F.2d 984, 992 (3d Cir. 1983) (citing Bell, 441 U.S. at 542). The first inquiry is whether the conditions serve any legitimate purposes. Hubbard v. Taylor, 538 F.3d 229, 232 (3d Cir. 2008). Second, if so, the Court must then determine whether the conditions are rationally related to that purpose. Id. Additionally, the prison's interest in maintaining security is "substantial." Stevenson, 495 F.3d at 70. Prison officials are entitled to "wide-ranging deference" in implementing policies designed to "preserve internal order and discipline and to maintain institutional security." Bell, 441 U.S. at 547. However, if prison officials implement measures in the name of security that are not rationally related to, or are excessive in light of that purpose, the measures constitute "punishment" in violation of the Due Process Clause. Stevenson, 495 F.3d at 67 (citation omitted).

However, the prohibition on punishing pretrial detainees does not apply when the detainee violates prison rules. Instead, prisons may, with certain procedural protections, impose sanctions against pretrial detainees for breaking such rules. See Rapier v. Harris, 172 F.3d 999, 1003 (7th Cir. 1999); Mitchel v. Dupnik, 75 F.3d 517, 524 (9th Cir. 1996); Collazo-Leon v. U.S. Bureau of Prisons, 51 F.3d 315, 318 (1st Cir. 1995); Mestre v. Wagner, No. 11-2480, 2012 WL 300724 (E.D. Pa. Jan. 31, 2012). Where the pretrial detainee complains of conditions imposed after he violated a prison rule, the Court must still apply the two-step analysis to determine whether the disciplinary conditions amounted to an unconstitutional punishment. (Mestre, 2012 WL 300724, at *5).

Defendants' statement of facts along with the affidavits of the correctional officers establish that Plaintiff's placement in RHU was based upon Plaintiff's rule violations during the cell and strip search and his subsequent aggressive actions toward Defendants, which resulted in the disciplinary hearing wherein he was found guilty of the offenses listed in the Dauphin

County Prison Disciplinary Report. (Doc. No. 158-6, p. 98.) Thus, it is apparent to this Court that there exists no genuine issue of material fact that Plaintiff's placement in the RHU was reasonably related to a legitimate governmental objective, which without more, does not amount to punishment. See Wolfish, 441 U.S. at 539; Mollett v. Leith, No. 09-1192, 2011 WL 5407359, at *9 (W.D. Pa. Nov. 8, 2011) (holding pretrial detainee failed to state a substantive due process claim when he was placed in restrictive housing in response to a potential security risk). Accordingly, the Court will grant Defendants' motion for summary judgment as to this claim.

2.     Procedural Due Process

Plaintiff also alleges that he was denied his procedural due process rights at the hearing because he was not given advance notice of the hearing and was thus unable to call witnesses or otherwise gather evidence in his defense. (Doc. No. 74 at 13.) "Due process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334 (1976). In the context of a pretrial detainee who is transferred into more restrictive housing for purely administrative purposes, prison officials need only provide "an explanation of the reason for their transfer as well as an opportunity to respond." Stevenson, 495 F.3d at 70. If, however, the transfer is for "disciplinary purposes," due process requires a "written notice of the charges" to enable to the inmate to "marshal the facts and prepare a defense." Id. (quoting Wolff. v. McDonnell, 418 U.S. 539, 594 (1974)).

It is undisputed that a disciplinary hearing was held on November 10, 2009, approximately fifteen (15) days after the October 26, 2009 cell and strip search incident. (Doc. No. 158-7, ¶¶ 7, 8; Doc. No. 158-6, p. 98.) Plaintiff maintains in his second amended complaint, as well as in his brief in opposition, that he was never served with a copy of the misconduct report until the time of the hearing. (Doc. No. 74 ¶ 68; Doc. No. 162, p. 10.) To further support

this assertion, Plaintiff has attached to his brief in opposition Exhibits "A" and "B," which purport to be two slightly different versions of the October 26, 2009 incident report filed by Defendant Rose. (Doc. No. 162-1, Ex. A, Ex. B.) Plaintiff asserts that Exhibit "A" is the incident report "signed by [Cuffaro] and [Hewitt] at [his] misconduct hearing and returned to him," while Exhibit "B" is the incident report maintained by Defendants. (Id.) Conspicuously missing from Exhibit "A" is a signature indicating who, if anyone, delivered the incident report to Plaintiff as well as the date and time the incident report was delivered. (Id. at Ex. A.) Exhibit "B" however, does contain a signature indicating who delivered the incident report as well as the date and time the incident report was delivered to Plaintiff. (Id. at Ex. B.) Plaintiff provides in his brief that these differences show that Defendants fabricated Exhibit "B" by later inserting a signature, date, and time in order to cover up the fact that Plaintiff was never provided this document until the date of his hearing. (Doc. No. 162, p. 10.)

In response to Plaintiff's assertion that Defendants fabricated the incident report, Defendants invite the Court to consider that Plaintiff was incarcerated on counterfeiting charges and has multiple prior charges involving crimen falsi, in order to attack Plaintiff's credibility. (Doc. No. 163, p. 3.) The Court, however, cannot engage in a credibility analysis at the summary judgment stage. See Santiago v. Fields, No. 05-CV-4884, 2009 WL 693642, at *10 n.8 (E.D. Pa. March 12, 2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The Defendants alternatively argue that Plaintiff manipulated and tampered with the incident report or the carbon copy he received that did not contain Officer Hosler's signature because it was the fourth page of the carbon document and Officer Hosler may not have pressed hard enough. (Doc. No. 163 p. 4.)

The Court, however, need look no further than the undisputed statement of material facts along with the affidavits provided by Defendants to determine that there is no genuine issue of material fact as it relates to Plaintiff's procedural due process claim. Defendants provide that the incident report from October 26, 2009 was signed by Rose and served by Correctional Officer Hosler on Plaintiff on October 26, 2009 at approximately 1:00 p.m. (Doc. No. 158-15 p. 5; Doc. No. 158-12, Hosler Aff.) This fact has been supported by as many as three other individuals, other than Officer Hosler, who affirm that Officer Hosler served Plaintiff the incident report and notice of institution disciplinary hearing on October 26, 2009, at approximately 1:00 p.m. (See Doc. No. 158-7 ¶ 13, Cuffaro Aff.; Doc. No. 158-13 ¶ 22, Cryder Aff.; Doc. No. 158-14 ¶ 13, Hewitt Aff.) In fact, the notice of institution disciplinary hearing is also dated October 26, 2009, and indicates that Plaintiff did not wish to have a representative or have any witnesses. (Doc. No. 158-15, p. 4.) Moreover, Officer Cryder, a correctional officer who participated in Plaintiff's escort to another cell block after the cell and strip search incident, and was presumably present when medical was assessing Plaintiff, affirms that Officer Hosler served Plaintiff with the incident report and disciplinary notice. (Doc. No. 158-13 ¶¶ 19, 21, 22.)

Accordingly, the Court finds that simply because Plaintiff's carbon copy of the October 26, 2009 incident report does not appear to contain Officer Hosler's signature indicating the date it was served, does not itself create a genuine issue of material fact that the incident report was not, in fact, served on that date. The Court reaches this decision based on its adoption of Defendants' statement of material facts that have not been disputed by Plaintiff, along with the four individual affidavits affirming that the incident report was in fact served on Plaintiff on October 26, 2009, as well as the production of the incident report itself containing the signature of Officer Hosler and the date and time of his personal service upon Plaintiff.

**IV.     CONCLUSION**

Based on the foregoing, Defendants' motion for summary judgment will be granted.  An appropriate Order follows.