## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CYRUS R. SANDERS, | : | |
|    Plaintiff, | : | |
| | : | No. 1:10-cv-01241 |
|    v. | : | |
| | : | (Judge Kane) |
| EMANUEL ROSE, et al., | : | |
|    Defendants | : | |

### MEMORANDUM

Presently before the Court is the motion for summary judgment (Doc. No. 189) filed by Defendants Emanuel Rose ("Rose"), Joann Cryder ("Cryder"), Jill Cuffaro ("Cuffaro"), Hewitt ("Hewitt"), Throne ("Throne"), and Unknown Officers ("Unknown Officers") following the United States Court of Appeals for the Third Circuit's remand of the above-captioned case (Doc. Nos. 182, 183). The motion is fully briefed and ripe for disposition. For the reasons that follow, the Court will deny the motion for summary judgment.

## I.     BACKGROUND

### A.     Procedural History

On June 14, 2010, pro se Plaintiff Cyrus R. Sanders ("Plaintiff"), who was then incarcerated at the Franklin County Jail in Chambersburg, Pennsylvania, initiated the above-captioned case by filing a complaint pursuant to 42 U.S.C. § 1983 against the Dauphin County Prison ("DCP") and several DCP employees, alleging that his civil rights were violated while he was a pretrial detainee at DCP. (Doc. No. 1.) Specifically, Plaintiff maintained that Defendants had violated his right of access to the courts, interfered with his mail, used excessive force against him, and violated his due process rights during a misconduct hearing. (Id.) The Court conducted a preliminary screening of the complaint pursuant to 28 U.S.C. § 1915(e)(2) and directed Plaintiff to file an amended complaint to correct certain pleading deficiencies. (Doc. No. 11.)

Plaintiff filed his amended complaint on March 16, 2011 (Doc. No. 14), and the Court ordered the amended complaint served upon the named Defendants on August 1, 2011 (Doc. No. 15).  Defendants moved to dismiss the amended complaint for Plaintiff's failure to comply with Rules 8 and 20 of the Federal Rules of Civil Procedure.  (Doc. No. 23.)  In a Memorandum and Order dated October 11, 2012, the Court granted Defendants' motion to dismiss.  (Doc. No. 63.)  Specifically, the Court dismissed Plaintiff's access to the courts claim for failure to state a claim upon which relief may be granted and dismissed all remaining claims for failure to adhere to Rules 8 and 20.  (Id.)  The Court, however, granted Plaintiff leave to amend to reassert his access to the courts claim as well as any other claims arising out of the same series of transactions or occurrences.  (Id.)

Plaintiff filed a second amended complaint on January 28, 2013.  (Doc. No. 74.)  Defendants subsequently moved to strike all but Count One of the second amended complaint for failure to comply with the Court's October 11, 2012 Memorandum and Order, and also moved to dismiss Count One for failure to state a claim.  (Doc. Nos. 76, 80.)  In a Memorandum and Order dated September 25, 2013, the Court granted Defendants' motion and closed the above-captioned case.  (Doc. No. 90.)  Plaintiff filed a timely notice of appeal.  (Doc. No. 91.)  On August 21, 2014, the Third Circuit affirmed in part and vacated in part this Court's judgment.  See Sanders v. Rose, 576 F. App'x 91, 92 (3d Cir. 2014).  Specifically, the Third Circuit concluded that Plaintiff had failed to state a plausible access to the courts claim in his second amended complaint.  See id. at 93-94.  However, the Third Circuit concluded further that Plaintiff's second amended complaint cured the Rule 20 violations.  See id. at 95.  The Third Circuit, therefore, remanded the matter for this Court to consider the merits of Plaintiff's remaining claims.  See id.

Upon remand, Defendants moved to dismiss the second amended complaint.  (Doc. No. 113.)  In a Memorandum and Order dated February 9, 2016, the Court granted in part and denied in part the motion to dismiss.  (Doc. Nos. 133, 134.)  Notably, the Court denied the motion to dismiss with respect to a retaliation claim asserted by Plaintiff in his second amended complaint. (Doc. Nos. 133, 134.)  Defendants subsequently filed a motion to clarify.  (Doc. No. 135.)  On February 26, 2016, the Court granted the motion to clarify and noted that the only claims remaining were Plaintiff's excessive force and failure-to-intervene claims against Defendants Rose, Cryder, Throne, and the Unknown Officers as well as his procedural and substantive due process claims against Defendants Hewitt and Cuffaro.  (Doc. Nos. 139, 140.)

Following discovery, the remaining Defendants filed a motion for summary judgment on February 7, 2017.  (Doc. No. 158.)  In a Memorandum and Order dated September 26, 2017, the Court granted Defendants' motion for summary judgment.  (Doc. Nos. 164, 165.)  Plaintiff filed a timely notice of appeal to the Third Circuit.  (Doc. No. 170.)  On March 1, 2018, the Third Circuit dismissed the appeal for Plaintiff's failure to either pay the requisite filing fee or file a motion for leave to proceed in forma pauperis.  (Doc. No. 175.)  Plaintiff subsequently paid the filing fee (Doc. No. 176), and on April 23, 2018, the Third Circuit granted Plaintiff's motion to reopen the appeal (Doc. No. 178).  On April 3, 2020, the Third Circuit vacated this Court's grant of summary judgment to the remaining Defendants, as well as this Court's Memorandum and Order granting Defendants' motion to clarify.  See Sanders v. Rose, 808 F. App'x 102, 104 (3d Cir. 2020). Specifically, the Third Circuit noted that because of this Court's "failure to mention the retaliation claim in orders subsequent to the order denying Defendants' motion to dismiss as to the retaliation claim, [it] could not discern the District Court's reasons for dismissing or granting summary judgment as to the retaliation claim."  See id. at 107-08.  The Third Circuit vacated this

Court's Memorandum and Order granting summary judgment in its entirety because "the facts underlying [Plaintiff's] retaliation claim [were] interrelated with the facts underlying the claims that the District Court considered on summary judgment." See id. at 108.  The Third Circuit directed this Court, on remand, to "direct the Defendants to file a motion for summary judgment that addresses all of the claims that survived Defendants' motion to dismiss, which we have determined includes [Plaintiff's] retaliation claim, unless they wish to proceed to trial as to any claim." See id.

The Third Circuit's mandate issued on May 12, 2020.  (Doc. No. 183.)  In an Order dated that same day, the Court reopened the above-captioned case and directed Defendants to file a motion for summary judgment addressing Plaintiff's remaining claims, which are: (1) Plaintiff's retaliation claim; (2) Plaintiff's excessive force and failure-to-intervene claims against Defendants Rose, Cryder, Throne, and the Unknown Officers; and (3) Plaintiff's procedural and substantive due process claims against Defendants Hewitt and Cuffaro.  (Doc. No. 184.)  After receiving an extension of time to do so (Doc. Nos. 185, 186), Defendants filed their motion for summary judgment and brief in support thereof on July 23, 2020 (Doc. Nos. 189, 190).  In an Order dated July 24, 2020, the Court directed Defendants to file a statement of material facts in accordance with Local Rule 56.1 within ten (10) days.  (Doc. No. 192.)  Defendants did so on July 30, 2020. (Doc. No. 193.)  After receiving an extension of time to do so (Doc. Nos. 198, 199), Plaintiff filed his brief in opposition and counterstatement of material facts on September 29, 2020 (Doc. Nos. 200, 201).

**B.      Allegations of Plaintiff's Second Amended Complaint**

Plaintiff claims that on October 7, 2009, while he was housed at DCP as a pretrial detainee, he requested an envelope and writing materials so that he could file a notice of appeal in

a pending legal matter before the October 19, 2009 filing deadline.  (Doc. No. 74 at 6.)  Although Plaintiff followed this up with several additional requests, DCP officials failed to provide him with any writing materials before the filing deadline because of an institutional policy of not issuing any legal or writing materials to indigent inmates until at least 30 days after commitment.  (Id. at 6-7.)  Because of his inability to acquire writing materials or an envelope, Plaintiff lost his appellate rights in that case.  (Id.)

Plaintiff also claims that, during the three months he was confined at DCP, he was only granted full access to the prison's law library on one occasion.  (Id. at 7.)  This restriction appears to have been a result of Plaintiff's placement in the prison's restricted housing unit ("RHU"), as Plaintiff also alleges that the "satellite" law library provided to RHU inmates was constitutionally inadequate.  (Id. at 8.)  According to Plaintiff, RHU inmates may spend no more than one hour per week in the satellite law library and must remain handcuffed during that time.  (Id.)

On October 23, 2009, Defendant Cuffaro responded in person to Plaintiff's requests for legal materials and asked Plaintiff whether he still needed legal postage.  (Id. at 9.)  Plaintiff told Cuffaro that his deadline had already passed on October 19, 2009.  (Id.)  On October 26, 2009, Defendant Cuffaro returned to the RHU and passed out "orientation verification forms" for the inmates to sign, which acknowledged that the inmates had been "given orientation instructions and access to DCP services."  (Id.)  Plaintiff signed "Mickey Mouse" on his form to protest his lack of access to legal materials.  (Id.)  Later, Defendant Cuffaro returned to the unit irate that someone had signed "Mickey Mouse" on a form.  (Id.)  Plaintiff admitted to signing "Mickey Mouse" and explained that he did it because he thought DCP's legal services was a "Mickey Mouse operation."  (Id.)

Subsequently, Plaintiff's cell was searched as part of a "block shake-down/rookie training drill." (<u>Id.</u> at 10.)  After the rookie officer, Defendant Tanya Brant ("Brant"), was finished searching Plaintiff's cell, Defendant Rose escorted Plaintiff to his cell and ordered Plaintiff to "get naked" and "show [him] that ass." (<u>Id.</u>)  Once Plaintiff disrobed and turned his back to Defendant Rose, Defendant Rose began punching him in the head, slammed him on a cement desk, and beat him to the floor.  (<u>Id.</u>)  The Unknown Officers then joined the assault and pinned Plaintiff to the floor while Defendant Rose twisted his arm behind his back and handcuffed him, partially dislocating Plaintiff's elbow in the process.  (<u>Id.</u>)  Plaintiff was then pulled onto his feet and held in a chokehold by Defendant Rose, who was aided by Defendant Throne and another unknown officer.  (<u>Id.</u>)  Plaintiff was then "shoved around and again beat to the floor on his stomach" by Defendant Rose and an unknown officer.  (<u>Id.</u>)  One of the officers held Plaintiff's cuffed arms behind his back to suspend him above the floor while two other officers kneed Plaintiff in the sides of his head at least ten times.  (<u>Id.</u> at 10–11.)  Defendants Cryder and Brant, as well as Officer Lehman, were present during the attack and did not intervene.  (<u>Id.</u> at 11.)  After the assault, the officers put Plaintiff's pants back on and dragged him to another cellblock while singing the "Mickey Mouse" theme song.  (<u>Id.</u>)

On November 2, 2009, Plaintiff was called to a hearing for a misconduct report that Defendant Rose issued against him, claiming that on October 26, 2009, Plaintiff "flinched aggressively" at him during the search of his cell.  (<u>Id.</u> at 13.)  Defendants Hewitt and Cuffaro presided over the hearing and sanctioned Plaintiff with sixty (60) days' confinement in the RHU. (<u>Id.</u>)  Plaintiff alleges that he was never notified of the misconduct charge before the hearing and was thus not given an opportunity to call any witnesses.  (<u>Id.</u>)

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires the Court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  See id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 257; Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the Court must view the facts and all reasonable inferences in favor of the nonmoving party.  See Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).  To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings.  When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required to go beyond his pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine issue.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The party opposing the

7

motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).  When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case that it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  See Celotex, 477 U.S. at 323; see also Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party.  See White, 862 F.2d at 59.  In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor.  See id. (citations omitted).  However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted."  See L.R. 56.1.  A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a pro se litigant.  These rules apply with equal force to all parties.  See Sanders v. Beard, Civ. No. 09-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (stating that pro se parties "are not excused from complying with court orders and the local rules of court"); Thomas v. Norris, Civ. No. 02-01854, 2006 WL 2590488, at *4 (M.D. Pa. Sept. 8, 2006) (explaining that pro se parties must follow the Federal Rules of Civil Procedure).

### III.   STATEMENT OF MATERIAL FACTS[1]

As of October 7, 2009, Plaintiff was housed at the DCP as a pretrial detainee facing federal charges.  (Doc. No. 193 ¶ 1.)  Upon his arrival on October 7, 2009, Plaintiff requested an envelope and writing materials so that he could file a notice of appeal in a pending legal matter before the deadline.  (Doc. No. 74 at 6; Doc. No. 193 ¶ 2.)  Plaintiff maintained that these materials were not supplied and that he "lost rights pertaining to this unrelated matter."  (Doc. No. 193 ¶ 2.)

At all relevant times, Defendant Cuffaro was employed by DCP as a Correctional Officer. (Id. ¶ 3.)  As such, Defendant Cuffaro's "duties at the prison included providing inmates with orientation verification forms regarding the Inmate Handbook and Dauphin County Prison Procedures which are acknowledged by inmates and which they (inmates) must sign as prison regulations require."  (Id. ¶ 4.)  When Plaintiff received the orientation form, "he did not sign his

---

[1] The Local Rules provide that in addition to the requirement that a party file a brief in opposition to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . as to which it is contended that there exists a genuine issue to be tried."  See M.D. Pa. L.R. 56. 1. The Rule further requires the inclusion of references to the parts of the record that support the statements.  See id.  Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.  See id.  Unless otherwise noted, the background herein is derived from Defendants' Rule 56.1 statement of facts.  (Doc. No. 193.)  Plaintiff's responsive statement of facts (Doc. No. 201) does not fully comply with Local Rule 56.1 because many of his denials of Defendants' allegations contain no references to the record.  The Court, therefore, will only consider those facts presented by Plaintiff that are properly supported by record citations.  See Coit v. Fisher, No. 1:18-cv-2439, 2020 WL 4260762, at *2 n.3 (M.D. Pa. July 24, 2020 (citing Lynch v. Ducasse, No. 3:18-cv-2044, 2020 WL 3547375, at *2 (M.D. Pa. June 30, 2020)).  Accordingly, unless otherwise noted, the Court deems the facts set forth by Defendants to be undisputed.  See M.D. Pa. L.R. 56. 1; Fed. R. Civ. P. 56(e)(2); Bowman v. Mazur, Civ. No. 08-173J, 2010 WL 2606291, at *3 (W.D. Pa. Oct. 30, 2010) ("Plaintiff's responsive statement of material facts is insufficient to create a genuine issue of material fact because it failed to comply with Local Rule 56.1.").

name but rather signed 'Mickey Mouse.'" (Id. ¶ 5.)  When confronted with this by Defendant

Cuffaro, Plaintiff stated that "he signed Mickey Mouse because he believed that she and/or the

prison had a Mickey Mouse operation." (Id. ¶ 6.)  Afterwards, Defendant Cuffaro returned to

Plaintiff's cell and asked him if he still needed an envelope.  (Id. ¶ 52.)  Plaintiff told Defendant

Cuffaro that he no longer needed the envelope.  (Id.)

Days later,[2] on October 26, 2009, DCP staff members were "engaged in a routine cell

search of five (5) cells per day to eliminate contraband and further the safety level of inmates and

staff." (Id. ¶ 7.)  Plaintiff's cell was searched as part of this program.  (Id. ¶ 8.)  During the

searches, "a shower handle was discovered to be missing and additional cell searches were

ordered." (Id. ¶ 9.)  As a result, Plaintiff's cell "was ordered to be searched a second time." (Id.

¶ 10.)  At the time of the second search, Defendant Rose "was teaching various classes to

Correctional Officer trainees and he was asked to assist in the cell search." (Id. ¶ 11.)  Defendant

Rose "acquiesced and had the trainees attend this second cell search of [Plaintiff's] cell." (Id.

¶ 12.)  About ten (10) to fifteen (15) staff members and trainees were present at the time of the

second search.  (Id. ¶ 13.)  Defendants had "searched multiple cells[,] including the upstairs

cells[,] long before they searched Plaintiff's cell." (Id. ¶ 56.)

Per DCP regulations, Plaintiff "was removed from his cell . . . and told that a cell search

was being conducted, also known as a 'shake down.'"[3] (Id. ¶ 14.)  Plaintiff "was highly irritated,

belligerent[,] and aggressive as he was removed from the cell and handcuffed to the stair rail for

---

[2] Defendants indicate that Plaintiff believed no more than two (2) days had passed from when
Plaintiff signed Block Orientation Form and when Defendant Cuffaro asked if he still needed an
envelope.  (Doc. No. 193 ¶ 53.)

[3] Defendants state that this was the second time Plaintiff was removed from his cell for a search
on October 26, 2009.  (Id. ¶ 14.)  Plaintiff, however, maintains that it was the first time.  (Doc.
No. 201 ¶ 14.)

the search." (Id. ¶ 15.) Plaintiff was also "yelling and screaming obscenities to staff and

trainees[,] calling them '[f******] pigs[,]" and using disrespectful language the entire time during

the search." (Id. ¶ 16.) Plaintiff "was aware of five (5) Correctional Officers that were present,

namely Rose, Throne, Cryder, Lehman[,] and trainee Bryant." (Id. ¶ 17.) Plaintiff "even said

things directly to or about the trainees or 'rookies.'" (Id. ¶ 18.)

Once the search was completed, Plaintiff was uncuffed and escorted back into his cell.

(Id. ¶ 19.) As Plaintiff entered his cell, he "stated 'it looks like pigs were rutting in here' or words

to that effect." (Id. ¶ 20.) The correctional officers "heard Plaintiff call them and/or trainees

'[f******] pigs' and state 'I have more time in prison [than] all of you together.'" (Id. ¶ 21.)

Once in the cell, per routine, "Plaintiff was ordered to strip and assume a strip search position."

(Id. ¶ 22.) "Plaintiff continued his aggressive and disruptive behavior, verbally assaulting staff

while he began undressing." (Id. ¶ 23.) Per procedure, "prisoners being strip searched are to

hand each article of clothing including shoes and socks to the Correctional Officer performing the

search." (Id. ¶ 25.) Plaintiff "refused to hand his articles of clothing to Rose and actually threw

his clothes in the direction of Rose and toward his bed."[4] (Id. ¶ 25.)

Plaintiff "continued his aggressive behavior and verbal disrespect[,] and stated 'how's

that?' . . . [while] throwing his clothes in the direction of Rose and the bed and bending over to

show his buttocks." (Id. ¶ 29.) In an Incident Report prepared after this event, Defendant Rose

stated that while Plaintiff was being strip searched, Plaintiff "flinched towards [him] in an act of

aggression." (Id. ¶ 44.) Defendants Rose and Throne immediately took Plaintiff to the ground in

---

[4] Plaintiff maintains that Defendant Rose "refused to take [his] socks and underwear . . . and actually said something to the effect, 'Do you think I want to touch those?' and grunted and looked towards the bed." (Doc. No. 201 ¶ 25.) Plaintiff states that he then "tossed them on the bunk to his right." (Id.)

response.  (Id. ¶ 30.)  They struggled with Plaintiff because Plaintiff refused to provide his hands

for handcuffing.[5]  (Id. ¶ 31.)  Once Plaintiff was handcuffed, he was removed from his cell and

taken to a separate cell for disciplinary reasons.  (Id. ¶ 32.)  Plaintiff "claims that when

correctional officers were dragging him from the block to the punishment block after the physical

altercation, someone was singing Mickey Mouse over the intercom while he was being dragged."

(Id. ¶ 59.)  Plaintiff, however, did not know who was singing and later confirmed it was not "the

Defendants or Correctional Officers involved in the physical altercation but others working for

the prison."  (Id.)

While waiting for medical staff to arrive, "Plaintiff was observed intentionally rubbing his

face back and forth on the floor to presumably enhance his injuries."  (Id. ¶ 37.)  Medical staff

responded, examined Plaintiff, and took pictures of his face and body.  (Id. ¶¶ 34-35.)  Plaintiff

"wanted to be left alone after the incident and did not require further medical treatment and was

not taken to the hospital."  (Id. ¶ 38.)  During this time, Officer Hosler delivered a Disciplinary

Report regarding the incident to Plaintiff.[6]  (Id. ¶ 36, 39,42- 45.)  The Disciplinary Report was

signed by Defendant Rose.  (Id. ¶ 45.)

On November 10, 2009, Plaintiff had his disciplinary hearing, at which he represented

himself.  (Id. ¶¶ 40-41.)  During the disciplinary hearing, Plaintiff stated: "'They tore the cell up

and I'm a farm boy" and "'looks like pigs were rutting here.  I didn't flinch on nobody.'"  (Id.

---

[5] Plaintiff maintains that he "was bent over and [Defendant] Rose jumped on his back and began
punching him in the head."  (Id. ¶ 31.)  He claims that "no attempt was made to handcuff" him.
(Id.)  Plaintiff also maintains that while handcuffed, he was shoved under the concrete desk, then
was picked up by Defendant Rose using a chokehold.  (Id. ¶ 32.)  He asserts that Defendant
Throne "had him by the throat, facing him."  (Id.)  Plaintiff "was then taken to the floor and kneed
repeatedly by [Defendant] Rose and another guard dressed in black."  (Id.)

[6] Plaintiff maintains that he was never served the Disciplinary Report.  (Id. ¶ 39.)

¶ 46.)  Plaintiff was found guilty of the offenses stated in the Disciplinary Report and was sanctioned with sixty (60) days' confinement in the RHU.  (Id. ¶ 51.)

## IV.    DISCUSSION

As noted supra, the following claims remain in the above-captioned case: (1) Plaintiff's retaliation claim; (2) Plaintiff's excessive force and failure-to-intervene claims against Defendants Rose, Cryder, Throne, and the Unknown Officers; and (3) Plaintiff's procedural and substantive due process claims against Defendants Hewitt and Cuffaro.  Defendants assert that they are entitled to summary judgment on the merits of all claims.  (Doc. No. 190.)  Defendants maintain further that they are entitled to qualified immunity with respect to Plaintiff's claims.  (Id.)  The Court considers each of Plaintiff's remaining claims below.

### A.    Excessive Force

Because Plaintiff was a pretrial detainee during all relevant times, the Due Process Clause of the Fourteenth Amendment governs his excessive force claim.  See Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015) (noting that "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment" (quoting Graham v. Conner, 490 U.S. 386, 395 n.10 (1989))).  "To demonstrate a due process violation, a detainee must prove 'that the force purposely or knowingly used against him was objectively unreasonable,' meaning 'that the actions [were] not rationally related to a legitimate nonpunitive government purpose.'"  Robinson v. Danberg, 673 F. App'x 205, 209 (3d Cir. 2016) (quoting Kingsley, 576 U.S. at 397, 398).  Courts consider the following factors to determine whether an officer used "objectively unreasonable" force:

> (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity of the security problem at

13

issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting.

Id. (quoting Kingsley, 576 U.S. at 397).

Upon consideration of the factors set forth above and the evidence cited to the Court by the parties, the Court concludes that there exist genuine issues of material fact that preclude summary judgment on Plaintiff's excessive force claim.  In support of their motion, Defendants have submitted numerous affidavits from those officers present during the cell and strip search as well as pictures taken of Plaintiff immediately after the incident.  Defendants Rose, Throne, Cryder, and Officers Lehman and Miller aver that Plaintiff was verbally aggressive and noncompliant during the strip search.  (Doc. Nos. 158-8, 158-9, 158-10, 158-11, 158-13.) Defendants Rose and Throne maintain that despite Defendant Rose's order that Plaintiff hand him his clothing to be searched, Plaintiff threw his clothing in Defendant Rose's direction.  (Doc. Nos. 158-8 at 3; 158-9 at 3.)  Defendants Rose and Throne aver further that during the strip search, Plaintiff made a quick, aggressive, "flinching" move toward Defendant Rose.  (Doc. Nos. 158-8 at 3; 158-9 at 3.)  Because of Plaintiff's movement, Defendants Rose and Throne took Plaintiff to the floor.  (Doc. Nos. 158-8 at 3; 158-9 at 3.)  They maintain that Plaintiff refused to be handcuffed at first but was ultimately restrained.  (Doc. Nos. 158-8 at 3-4; 158-9 at 3-4.) Defendant Rose provides that at no time did he or any other officer punch or kick Plaintiff.  (Doc. No. 158-8 at 4.)  Defendants maintain that there were no signs of visible injury and that Defendant Rose was never "enraged, out of control, or irritated with" Plaintiff during the incident. (Doc. Nos. 158-8 at 4; 158-9 at 4; 158-10 at 3; 158-11 at 3; 158-13 at 3.)  The photographs submitted by Defendants document redness around his left eye.  (Doc. No. 158-16.)  Defendants provide, however, that while waiting for medical to arrive, Plaintiff was seen "rubbing his face on

14

the concrete floor of the cell in an attempt to embellish, worse, or create injuries to his face and eye." (Doc. No. 158-12 at 2.)

To support his opposition to Defendants' motion, Plaintiff has submitted a copy of the same photograph of his eye as well as declarations from two inmates, Chance Bonner and Eddy Petitto. (Doc. No. 200-1 at 16-20.) Inmate Petitto's declaration, however, was not sworn to before a notary public and has not been signed under the penalty of perjury. The Court, therefore, will not consider it for purposes of summary judgment. See 28 U.S.C. § 1746 (setting forth the requirements for an unsworn declaration, including that it must indicate that it is "true under penalty of perjury"). Inmate Bonner's declaration has been sworn to before a notary public. (Doc. No. 200-1 at 18.) He provides that his cell was directly next to Plaintiff's and that he heard a commotion in Plaintiff's cell and saw several guards rush towards Plaintiff's cell. (Id. at 17.) Inmate Bonner's declaration, however, provides nothing more than what he heard and is not inconsistent with Defendants' accounts set forth in their affidavits.

Defendants, however, overlook Plaintiff's sworn deposition testimony. During his deposition, Plaintiff testified that Defendant Rose ordered him to take off his clothes for a strip search. (Doc. No. 158-5 at 66-67.) He stated that when he took off his clothing and tried to hand it to Defendant Rose, Defendant Rose "basically like grunted and looked at the bed." (Id. at 68.) Plaintiff, therefore, threw his clothes on the bed. (Id. at 68-69.) Plaintiff subsequently "turned, spread [his] cheeks, and [said] how's that" so that Defendant Rose could conduct a search of Plaintiff's anus. (Id. at 71.) At that point, Plaintiff was facing the back of the cell and testified that his head was between the concrete desk and stool. (Id.) Plaintiff indicated that no sooner did he say "how's that," Defendant Rose was "on [his] back punching [him] in the head, violently." (Id. at 72.) Defendant Rose put Plaintiff in a headlock. (Id. at 72-73.) Defendant Throne and

another officer choked Plaintiff and grabbed his face.  (Id. at 74-76.)  Plaintiff testified further that

another "officer in black was punching [him]."  (Id. at 76.)  He indicated that he was slammed

into the desk and then the floor before he was handcuffed.  (Id. at 76-77.)  Plaintiff noted that

after he was handcuffed, Defendant Rose and another officer began kneeing him in the head

repeatedly.  (Id. at 78.)  He did not receive any medical treatment.  (Doc. No. 158-6 at 12.)

Plaintiff testified that at no time during the strip search did he make any sort of movement

towards the officers.  (Id. at 29-30.)  He indicated further that he received physical therapy for his

shoulder when he was transferred from DCP to the Franklin County Prison.  (Id. at 58-59.)

Plaintiff claimed that his right shoulder was "weak" and had "like a big gap, dead spot in it."  (Id.

at 59.)  He testified further that he still could not fully extend his right elbow and that he

experienced "real[ly] bad tendonitis" ever since the use of force.  (Id. at 60.)  Plaintiff also noted

that he was diagnosed with and treated for posttraumatic stress disorder while incarcerated at a

federal facility as well as while at a halfway house.  (Id. at 61-64.)

    Defendants assert that summary judgment is warranted because, inter alia, the injures

alleged by Plaintiff are de minimis.  (Doc. No. 190 at 25-29.)  The Court notes that Plaintiff had

provided no medical records to support his testimony that he received physical therapy as well as

treatment for posttraumatic stress disorder.  Nevertheless, even if Plaintiff's injuries were de

minimis, "[a] detainee's injury is only one of several factors to be considered in determining

whether the application of force was punitive."  See Robinson, 673 F. App'x at 209-10

(concluding that the district court "erred by focusing exclusively on the severity of [the detainee-

plaintiff's] injury at the expense of the other Kingsley factors").  In the instant case, Plaintiff's

version of events, set forth in his sworn deposition, directly contradict Defendants' version and

create questions of fact regarding the need for force, the amount of force used, efforts made to

temper or limit the amount of force, the severity of the threat, and whether Plaintiff was actively resisting.  See id. at 209 (quoting Kingsley, 576 U.S. at 397); see also Lupyan v. Corinthian Colls., Inc., 761 F.3d 314, 320 (3d Cir. 2014) (noting that "a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment").  Such issues of fact will likely turn on a credibility assessment, which the Court may not undertake at this stage.  See Anderson, 477 U.S. at 252; see also Paladino v. Newsome, 885 F.3d 203, 209 (3d Cir. 2018) (concluding, in a case involving a pro se plaintiff, that "sworn deposition testimony" established a genuine issue of material fact). Given the discrepancies in the parties' view of the events, and viewing the facts in the light most favorable to Plaintiff, a reasonable juror could conclude that Defendants violated Plaintiff's Fourteenth Amendment rights by subjecting him to the use of excessive force.  Accordingly, the Court will deny summary judgment as to Plaintiff's excessive force claim.

**B.  Failure to Intervene**

As corrections officers, Defendants "were responsible for Plaintiff's safety and had a duty to protect him from violence."  See Ewing v. Cumberland Cty., 152 F. Supp. 3d 269, 294 (D.N.J. 2015).  Corrections officers have "a duty to take reasonable steps to protect a victim from another officer's use of excessive force."  See Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002) (internal quotations omitted).  When a detainee claims that an officer failed to protect him from another officer's use of excessive force, the detainee must prove that: (1) the officer had a duty to intervene; (2) the officer had the opportunity to intervene; and (3) the officer failed to intervene. See id. at 650-51.  Officers, however, are "only liable if there is a realistic and reasonable opportunity to intervene."  See id. at 651.  While "legally distinct, the fate of [a] plaintiff's failure to intervene claim is closely linked to that of [an] excessive force claim since, by definition, if

there was no excessive force then there can be no failure to intervene." See Abdullahi v. City of Madison, 423 F.3d 763, 767-68 (7th Cir. 2005).

Plaintiff suggests that Defendants Cryder, Throne, and Unknown Officers (including Brant and Lehman) failed to intervene in the use of excessive force by Defendant Rose.  As set forth supra, the evidence before the Court indicates that Defendant Throne assisted in the use of force.  Moreover, an affidavit submitted by Officer Miller suggests that after Plaintiff was taken to the floor, he "dashed into the cell and was followed by other Trainees to provide any needed assistance."  (Doc. No. 158-11 at 3.)  Moreover, Defendant Lehman was present in the cell during the use of force.  (Doc. No. 158-10 at 3.)  Defendants argue that Defendant Cryder "could not possibly intervene as she did not witness the incident."  (Doc. No. 190 at 32.)  In her affidavit, Defendant Cryder states that she remained outside the cell during the incident and was "unable to assist due to the sheer number of staff and trainees either in the cell or at the cell door."  (Doc. No. 158-13 at 3.)  However, "based on [her] experience, [she] identified that a scuffle was taking place due to the noises [she] heard coming from the cell."  (Id.)  In his deposition, however, Plaintiff testified that he was able to recognize Defendant Cryder during the search.  (Doc. No. 158-5 at 56-58.)  Given that there exist genuine issues of material fact with respect to Plaintiff's excessive force claim, the Court concludes that, viewing the facts in the light most favorable to Plaintiff, a reasonable juror could conclude that Defendants Throne, Cryder, and Unknown Officers violated Plaintiff's rights by failing to intervene in the use of excessive force by Defendant Rose.  See Abdullahi, 423 F.3d at 767-68.  Accordingly, the Court will deny summary judgment as to Plaintiff's failure to intervene claim.

### C.      Procedural and Substantive Due Process

#### 1.      Procedural Due Process

Plaintiff alleges further that his procedural due process rights were violated because he was not given advance notice of his disciplinary hearing and, therefore, was unable to call witnesses or otherwise gather evidence in his defense.  (Doc. No. 74 at 13.)  "Due process is flexible and calls for such procedural protections as the particular situation demands."  See Mathews v. Eldridge, 424 U.S. 319, 334 (1976).  In the context of a pretrial detainee who is transferred to more restrictive housing for purely administrative purposes, officials need only provide "an explanation of the reason for [his] transfer as well as an opportunity to respond."  See Stevenson, 495 F.3d at 70.  However, "the imposition of disciplinary segregation [upon pretrial detainees] for violation[s] of prison rules and regulations cannot be imposed without providing the due process protections set forth in Wolff v. McDonnell, 418 U.S. 539 (1974)."  See Kanu v. Lindsey, 739 F. App'x 111, 116 (3d Cir. 2018).  These protections "include the right to receive written notice of the charges at least 24 hours before the hearing, the opportunity to present witnesses and documentary evidence, and a written statement of the reasons for the disciplinary action taken and the supporting evidence."  See id. (citing Wolff, 418 U.S. at 563-66).

In the instant case, it is undisputed that Plaintiff received a disciplinary hearing on November 10, 2009, fifteen (15) days after the October 26, 2009 cell and strip search incident. (Doc. No. 193 ¶ 40.)  As noted supra, Plaintiff maintains that he was never served a copy of the misconduct report until the time of his hearing.  (Doc. Nos. 74 ¶ 68; 200 at 17.)  In support of this assertion, Plaintiff has submitted two (2) slightly different versions of the October 26, 2009 incident report filed by Defendant Rose.  (Doc. No. 200-1 at 2-3.)  According to Plaintiff, the first, Exhibit A, was "signed by Defendants Counselor Cuffaro and Lt. Hewitt at [his] misconduct

hearing . . . and given to him." (Doc. No. 200 at 17.)  He argues that the second, Exhibit B, is the

copy that was maintained by Defendants.  (Id.)  Missing from Exhibit A is a signature indicating

who, if anyone, delivered the incident report to Plaintiff, as well as the date and time the incident

report was delivered.  (Doc. No. 200-1 at 2.)  Exhibit B, however, does contain a signature

indicating who delivered the incident report, as well as the date and time the report was delivered

to Plaintiff.  (Id. at 3.)  Plaintiff maintains that these differences establish that Defendants

fabricated Exhibit B by later inserting a signature, date, and time to cover up the fact that Plaintiff

was never provided this document until the date of his hearing.  (Doc. No. 200 at 10.)

In support of summary judgment, Defendants have submitted various affidavits, copies of

Plaintiff's disciplinary documents, and a transcript from Plaintiff's deposition.  The copy of the

Incident Report submitted by Defendants is clearly signed by Officer Hosler and indicates that he

delivered the Incident Report to Plaintiff on October 26, 2009, at 1:00 p.m.  (Doc. No. 158-15 at

5.)  Moreover, the Notice of Institution Disciplinary Board Hearing indicates that Plaintiff did not

wish to have a representative or call any witnesses.  (Id. at 4.)  Moreover, Plaintiff signed a copy

of the Prisoner Rights at Institution Disciplinary Hearings, indicating his understanding that he

was entitled to receive notice of the charges at least twenty-four (24) hours before his hearing and

had the right to call witnesses and have a representative.  (Id. at 6.)  That document, however, is

undated.  Officer Hosler and Defendants Cuffaro, Hewitt, and Cryder aver that Officer Hosler

served the incident report and notice of hearing on Plaintiff on October 26, 2009.  (Doc. Nos. 158-

7 at 3; 158-12 at 2; 158-13 at 3; 158-14 at 2.)

As noted above, Defendants have submitted the transcript of Plaintiff's deposition in

support of their motion for summary judgment.  (Doc. Nos. 158-5; 158-6.)  Defendants overlook,

however, that on multiple occasions throughout his deposition, Plaintiff testified that he was never

served a copy of the incident report.  (Doc. No. 158-6 at 16-19, 49.)  Instead, Plaintiff averred that he did not learn that he had received a misconduct charge until officers came to his cell to take him to his hearing.  (Id. at 18, 49.)  Plaintiff also testified that because he never received notice of the misconduct, he was unable to provide information for any potential witnesses ahead of his hearing.  (Id. at 24.)  He further stated that he did not know he had the right to a representative because he never received the notice.  (Id. at 50-52.)  Plaintiff testified that he did not know about these rights until his hearing.  (Id. at 58.)

Given this, it is the Court's view that there exist genuine issues of material fact regarding whether Plaintiff received procedural due process with respect to his misconduct proceedings. Such issues of fact will likely turn on a credibility assessment, which the Court may not undertake at this stage.  See Anderson, 477 U.S. at 252; see also Paladino, 885 F.3d at 209; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) (noting that if a genuine issue of material fact exists, the court "cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent"). Given the discrepancies in the parties' view of the events, and viewing the facts in the light most favorable to Plaintiff, a reasonable juror could conclude that Defendants violated Plaintiff's procedural due process rights by not providing him advance notice of the misconduct charge, thereby precluding Plaintiff from requesting a representative and presenting witnesses in his defense at his disciplinary hearing.  Accordingly, the Court will deny summary judgment as to Plaintiff's procedural due process claim.

### 2.    Substantive Due Process

The Court must determine whether Plaintiff's sentence of sixty (60) days in the RHU qualifies as a "punitive" sentence under the Fourteenth Amendment.  See Stevenson v. Carroll,

495 F.3d 62, 67 (3d Cir. 2007).  Unlike sentenced inmates, pretrial detainees have a liberty

interest in being free from punishment prior to conviction under the Due Process Clause.  See Bell

v. Wolfish, 441 U.S. 520, 535-36 (1979).  In determining whether a pretrial condition rises to the

level of punishment, the Court examines whether it is imposed for the purpose of punishment or is

"an incident of some other legitimate governmental purpose."  See Hubbard v. Taylor, 399 F.3d

150, 158 (3d Cir. 2005) (quoting Bell, 441 U.S. at 538-39)).  A given restriction imposed on an

inmate "amounts to punishment when there is a showing of express intent to punish on the part of

the detention facility officials, when the restriction or condition is not rationally related to a

legitimate non-punitive government purpose, or when the restriction is excessive in light of that

purpose."  See Stevenson, 495 F.3d at 68 (quoting Rapier v. Harris, 172 F.3d 999, 1005 (7th Cir.

1999)).

Given this framework, courts engage in a two-step inquiry to determine whether a pretrial

detainee's confinement conditions violate his substantive due process rights.  See Union Cty. Jail

Inmates v. Di Buono, 713 F.2d 984, 992 (3d Cir. 1983) (citing Bell, 441 U.S. at 542).  The first

inquiry is whether the conditions serve any legitimate purposes.  See Hubbard v. Taylor, 538 F.3d

229, 232 (3d Cir. 2008).  Second, if so, the Court must then determine whether the conditions are

rationally related to that purpose.  See id.  Additionally, the prison's interest in maintaining

security is "substantial."  See Stevenson, 495 F.3d at 70.  Prison officials are entitled to "wide-

ranging deference" in implementing policies designed to "preserve internal order and discipline

and to maintain institutional security."  See Bell, 441 U.S. at 547.  However, if prison officials

implement measures in the name of security that are not rationally related to, or are excessive in

light of that purpose, the measures constitute "punishment" in violation of the Due Process

Clause.  See Stevenson, 495 F.3d at 67 (citation omitted).

The prohibition on punishing pretrial detainees does not apply when the detainee violates prison rules.  Instead, prisons may, with certain procedural protections, impose sanctions against pretrial detainees for breaking such rules.  See Rapier v. Harris, 172 F.3d 999, 1003 (7th Cir. 1999); Mitchel v. Dupnik, 75 F.3d 517, 524 (9th Cir. 1996); Collazo-Leon v. U.S. Bureau of Prisons, 51 F.3d 315, 318 (1st Cir. 1995); Mestre v. Wagner, No. 11-2480, 2012 WL 300724 (E.D. Pa. Jan. 31, 2012).  Where the pretrial detainee complains of conditions imposed after he violated a prison rule, the Court must still apply the two-step analysis to determine whether the disciplinary conditions amounted to an unconstitutional punishment.  See Mestre, 2012 WL 300724, at *5.  When prison officials show "that a restrictive housing assignment is predicated on a legitimate managerial concern and is therefore not arbitrary or purposeless," the substantive due process inquiry is typically foreclosed.  See Stevenson, 495 F.3d at 69.

The facts underlying Plaintiff's substantive due process claim are intertwined with those underlying his excessive force, retaliation, and procedural due process claims.  Defendants, in their statement of facts as well as their various affidavits, suggest that Plaintiff displayed aggressive behavior during the cell and strip search, resulting in the disciplinary hearing wherein he was found guilty.  (Doc. Nos. 158-7; 158-8; 158-9; 158-10; 158-11; 158-13; 193.)  As noted supra, however, Plaintiff maintained, during his deposition, that at no time did he make any sort of movement towards the officers during the strip search.  (Doc. No. 158-6 at 29-30.)  Plaintiff testified further that he was not "using profanity at all toward any of the officers during the cell search."  (Id. at 46.)  Given the parties differing versions of the events, a genuine issue of material fact exists with respect to whether Plaintiff's placement in the RHU was reasonably related to a legitimate governmental objective or amounted to punishment.  See Bell, 441 U.S. at 539.  Again, such issues of fact will likely turn on a credibility assessment, which the Court may not undertake

at this stage.  See Anderson, 477 U.S. at 252; see also Paladino, 885 F.3d at 209.  Accordingly, the Court will deny Defendants summary judgment with respect to Plaintiff's substantive due process claim.

### D.    Retaliation

To state a retaliation claim under the First Amendment, a plaintiff bears the burden of satisfying three (3) elements.  First, a plaintiff must prove that he was engaged in a constitutionally protected activity.  See Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001).  Second, a plaintiff must demonstrate that he "suffered some 'adverse action' at the hands of prison officials."  See id. (quoting Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)).  This requirement is satisfied when the adverse action is "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights."  See id. (quoting Suppon v. Dadonna, 2013 F.3d 228, 235 (3d Cir. 2000)).  Third, a prisoner must prove that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him."  See Rauser, 241 F.3d at 333-34 (quoting Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

The mere fact that an adverse action occurs after either a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the two events.  See Lape v. Pennsylvania, 157 F. App'x 491, 498 (3d Cir. 2005).  Only when the facts of a particular case are "unusually suggestive" of a retaliatory motive will temporal proximity, on its own, support an inference of causation.  See Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997).  If a prisoner establishes a prima facie case of retaliation, the burden shifts to prison officials to show, by a preponderance of the evidence, that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological

interest."  See Rauser, 241 F.3d at 334.  "This is often referred to as the 'same decision

defense.'"  Watson v. Rozum, 834 F.3d 417, 422 (3d Cir. 2016).  If the prison officials can make

this showing, it defeats the retaliation claim.  See Carter v. McGrady, 292 F.3d 152, 159 (3d Cir.

2002).

### 1.        Protected Activity

In his amended complaint, Plaintiff alleges that officers used excessive force against him

to "maliciously and sadistically punish [him] out of retaliation because he angered [Defendant]

Cuffaro by signing 'Mickey Mouse' on her intake form."  (Doc. No. 74 ¶ 59.)  He contends that

he signed "Mickey Mouse" to the intake form to protest the failure of DCP to provide him with

legal materials to file a notice of appeal in an unrelated case.  (Doc. No. 200 at 18.)  Defendants

first assert that they are entitled to summary judgment because Plaintiff's action of signing

"Mickey Mouse" on the intake form is not constitutionally protected activity.  (Doc. No. 190 at

45-51.)  The Court, therefore, must determine whether Plaintiff "had a First Amendment right to

express his displeasure with the prison's system for access to legal materials."  See Sanders, 808

F. App'x at 107 n.6.

The United States Supreme Court has noted that "[f]ree speech is not absolute at all times

and under all circumstances."  See Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942).

Types of speech that are unprotected include, but are not limited to, fighting words, threats,

obscenity, and speech that "imminently incites illegal activity."  See Parran v. Wetzel, No. 3:14-

cv-1522, 2016 WL 1162328, at *6 (M.D. Pa. Mar. 23, 2016).  It is well established that inmates

retain "the protections afformed by the First Amendment," see O'Lone v. Estate of Shabazz, 482

U.S. 342, 348 (1987), but they "retain[] [only] those First Amendment rights that are not

inconsistent with [their] status as [] prisoner[s] or with the legitimate penological objectives of the

corrective system."  See Pell v. Procunier, 417 U.S. 817, 822 (1974).  An inmate's First

Amendment right to free speech, therefore, may be curtailed if the inmate's speech poses "the

likelihood of disruption to prison order or stability, or otherwise interferes with the legitimate

penological objectives of the prison environment."  See Jones v. N.C. Dep't of Corr., 433 U.S.

119, 132 (1977); see also Turner v. Safley, 482 U.S. 78, 87 (1987) (noting that prison regulations

can restrict free speech if such restrictions are "reasonably related to legitimate penological

interests").  "Thus, an inmate's First Amendment rights do not include the right to debate staff

orders prior to obeying them, disregard prison rules, or engage in activities that may incite a

disturbance."  See Parran, 2016 WL 1162328, at *6.

     In Turner, the Supreme Court set forth the following four (4) factors for a court to

consider when assessing the reasonableness of a prison regulation:

> First, there must be a valid rational connection between the prison regulation and
> the legitimate governmental interest put forward to justify it, and this connection
> must not be so remote as to render the policy arbitrary or irrational.  Second, a court
> must consider whether inmates retain alternative means of exercising the
> circumscribed right.  Third, a court must take into account the costs that
> accommodating the right would impose on other inmates, guards, and prison
> resources generally.  And fourth, a court must consider whether there are
> alternatives to the regulation that fully accommodate the prisoner's rights at de
> minimis cost to valid penological interests.

DeHart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000) (internal quotation marks and alterations omitted).

Prison officials have the burden of demonstrating the first Turner factor.  See Sharp v. Johnson,

669 F.3d 144, 156 (3d Cir. 2012).  If prison officials meet their burden under the first Turner

factor, the Court then considers the following three (3) factors.  See id.

     In support of the first factor, Defendants assert that the regulation to be reviewed "would

be the required execution of the orientation or intake form which of course is attached as an

Exhibit to the original Motion for Summary Judgment as well as to this Motion for Summary

Judgment without change." (Doc. No. 190 at 49.) They maintain that the "legitimate, proper, safe[,] and efficient method of running the prison is drastically undermined" when inmates "do not properly execute orientation/intake forms." (Id. at 50.) A review of the record, however, reveals that Defendants have not submitted a copy of the orientation or intake form. During his deposition, Plaintiff testified that the block orientation form is a form that all inmates at DCP must sign to indicate that they have received the inmate handbook. (Doc. No. 158-5 at 35-36.) He further testified that after he signed Mickey Mouse on the form, Defendant Cuffaro returned to the block, "irate and screaming," threatening to "lock the whole block down." (Id. at 44-45.) In her affidavit, Defendant Cuffaro states that as a Treatment Specialist, one of her duties is to "conduct block orientation for inmates. Each inmate signs the roster, indicating receipt of orientation." (Doc. No. 158-7 at 3.) She avers further that "[t]hrough [her] years of experience conducting orientation, some inmates will sign the roster in a manner other than their name (i.e., fictional name, fictional character, vulgarity, profanity). When that occurs, [she] simply instruct[s] the inmate to write their real name." (Id. at 4.)

Upon review of the record, the Court concludes that Defendants have not met their burden of establishing the first Turner factor. As noted supra, Defendants have not provided a copy of the orientation form to the Court. Moreover, Defendants have cited no evidence to the Court suggesting that improper execution of this form threatens prison safety and security. Rather, Defendant Cuffaro's indication that she simply asks an inmate who signs the roster with something other than their name to sign the form again using their real name does not lend support to Defendants' argument that prison safety and security is threatened when inmates improperly execute the form. Because Defendants have not met their burden with respect to the first Turner factor, the Court will not consider the other three (3) factors set forth above.

Given Defendants' failure to demonstrate that the regulation at issue is a proper limitation upon inmates' First Amendment rights to free speech, the Court concludes that Plaintiff was engaged in constitutionally protected activity when he signed Mickey Mouse on the block orientation form.  During his deposition, Plaintiff testified that he signed Mickey Mouse to protest the failure of DCP to provide him with legal materials to file a notice of appeal in an unrelated case.  (Doc. No. 158-5 at 43-45.)  "Nothing in the First Amendment itself suggests that the right to petition for redress of grievances only attaches when the petitioning takes a specific form." Holzemer v. City of Memphis, 621 F.3d 512, 521 (6th Cir. 2010).  The Court recognizes that "certain types of 'petitioning' would be obviously inconsistent with imprisonment (marches or group protests, for example)." See Pearson v. Welborn, 471 F.3d 732, 741 (7th Cir. 2006).  Here, however, there is no evidence before the Court to suggest that Plaintiff's form of protest threatened institutional safety and security.  Given this, the Court concludes that Plaintiff was engaging in protected activity when he signed Mickey Mouse on the orientation form; therefore, the Court will consider the second and third elements of a retaliation claim.

## 2.      Adverse Action and Causal Link

To be actionable under § 1983, the adverse action "need not be great" but "must be more than de minimis." See McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006).  In the instant case, Plaintiff alleges that he was subjected to excessive force during the cell and strip search "because he angered [Defendant] Cuffaro by signing 'Mickey Mouse' on her intake form."  (Doc. No. 74 ¶ 59.)  Defendants assert that the use of force "occurred **NOT** as a result of any expression of First Amendment rights . . . but rather as a real time split second decision made when [Plaintiff] rejected the cell search and body cavity search and essentially fought back against the correctional officers attempting to do their job."  (Doc. No. 190 at 53.)  As noted supra, however, there exist

genuine issues of material fact precluding the Court from granting summary judgment on Plaintiff's excessive force claim.  Given that those facts are intertwined with Plaintiff's retaliation claim, there exists a genuine issue of material fact regarding whether Plaintiff experienced adverse action in response to his protected activity.

With respect to the third prong of a retaliation claim, while causation may be established by direct or circumstantial evidence, "motivation is almost never subject to proof by direct evidence."  See Watson, 834 F.3d at 422.  Thus, motivation is typically demonstrated by "evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link."  See id.  During his deposition, Plaintiff testified that "[n]o more than two days passed" between when he signed Mickey Mouse on the orientation form and when the cell and strip search occurred.  (Doc. No. 158-5 at 48.)  Plaintiff further testified that when he was being removed from the block after the search, officers were singing the Mickey Mouse song.  (Doc. No. 158-6 at 21.)  Inmate Chance Bonner also avers that officers were singing the Mickey Mouse song over the intercom as Plaintiff was removed from the unit.  (Doc. No. 200-1 at 17.) Viewing the facts in the light most favorable to Plaintiff, a reasonable juror could find a causal link between Plaintiff's protected activity and the use of force.

In sum, given the parties' discrepancies in their version of events, and viewing the facts in the light most favorable to Plaintiff, a reasonable juror could conclude that Defendants violated Plaintiff's First Amendment rights by using excessive force against him to retaliation against Plaintiff's decision to sign Mickey Mouse on the orientation form.  Accordingly, the Court will deny summary judgment as to Plaintiff's retaliation claim.

### E.      Qualified Immunity

As noted supra, Defendants assert that they are entitled to qualified immunity with respect to Plaintiff's claims.  (Doc. No. 190 at 16-19, 59.)  "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To determine whether a right was clearly established, the Court must ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  See Schmidt v. Creedon, 639 F.3d 587, 598 (3d Cir. 2011).  "If it would not have been clear to a reasonable officer what the law required under the facts alleged, then he is entitled to qualified immunity."  Id.  Stated differently, for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate."  See al-Kidd, 563 U.S. at 741.  As the Supreme Court recently noted, "[t]his demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'"  See District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  Accordingly, "there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited."  See Mammaro v. N.J. Div. of Child Prot. & Permanency, 814 F.3d 164, 169 (3d Cir. 2016) (quoting McLaughlin v. Watson, 271 F.3d 566, 572 (3d Cir. 2001)).

The United States Supreme Court's decision in White v. Pauly, 137 S. Ct. 548 (2017), clarifies the Court's inquiry in this regard.  In that case, the Supreme Court reaffirmed that its case law "do[es] not require a case directly on point" for a right to be clearly established, but "existing

precedent must have placed the statutory or constitutional question beyond debate."[7]  See id. at 551 (internal quotation marks omitted) (quoting Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)). The Supreme Court reiterated that the clearly-established law "must be 'particularized' to the facts of the case," and cautioned that the fact that a case presents a unique set of facts and circumstances is an "important indication" that a defendant's conduct at issue did not violate a "clearly established" right.  See id. at 552 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

In support of their argument, Defendants assert that, "[b]ased on the facts and circumstances of this case," the "only possible conclusion" is that they enjoy qualified immunity. (Doc. No. 190 at 16-17.)  Defendants maintain that they "were faced with a rebellious and noncomplying inmate and detainee" and that they "utilized only that level of force which was necessary to contain the Plaintiff and protect staff from his erratic, aggressive[,] and challenging behavior."  (Id. at 18.)  They suggest that "[t]here is no case law to place [them] on notice that they could have violated the Constitution by taking Plaintiff Sanders to the ground in immediate response to his uncontrolled behavior and challenging aggressive movements in the small crowded cell toward Defendant Lieutenant Rose."  (Id. at 19.)  As discussed in depth supra, however, genuine issues of material fact exist with respect to the use of force incident, and those issues of material fact impact Plaintiff's retaliation, failure to intervene, and due process claims, as well.  At this time, therefore, the Court cannot conclude that Defendants are entitled to qualified immunity.

---

[7] There may be the rare "obvious case," however, where "a body of case law" is not necessary. See Brosseau v. Haugen, 543 U.S. 194, 199 (2004).

## V.     CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Doc. No. 189) will be denied.  An appropriate Order follows.